DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

# Evaluation of Holly Shuster

**Hutchinson Black & Cook, LLC**

921 Walnut Street, Suite 200

Boulder, CO 80302

Prepared by:

Donna Peters, Psy.D.

Licensed Clinical Forensic Psychologist

1720 South Bellaire Street, Suite 907

Denver, CO 80222

March 13, 2024

_____

Donna Peters, Psy.D.

Licensed Clinical Forensic Psychologist

License #3153

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-1

**EXHIBIT 2**

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

# Peters' Expert Report

## Contents

I.    SCOPE OF ENGAGEMENT ........................................................................................... 4

II.    IDENTIFYING INFORMATION AND REFERRAL FOR EVALUATION ............................ 5

    CASE SUMMARY .................................................................................................................. 5

III.    METHOD OF EVALUATION ...................................................................................... 7

    PROCESS AND SCOPE OF THE EVALUATION ...................................................................... 7

      Documents Reviewed ....................................................................................................... 7

      Interviews and Consultations ........................................................................................... 9

      Psychological Measures and Testing ............................................................................... 9

    PREPARATION OF PARTICIPANTS ....................................................................................... 9

IV.    CURRENT PSYCHOLOGICAL OBSERVATIONS ........................................................ 11

    MENTAL STATUS .............................................................................................................. 11

V.    CLINICAL INFORMATION .................................................................................... 12

    DEVELOPMENTAL AND CLINICAL HISTORY ..................................................................... 12

      Family History ................................................................................................................ 12

      Education and Work History .......................................................................................... 13

      Adverse Events History ................................................................................................. 14

        Age 10 ....................................................................................................................... 14

        Age 16 ....................................................................................................................... 14

        Age 18 ....................................................................................................................... 15

        Age 19 ....................................................................................................................... 15

      Legal History ................................................................................................................. 17

      Relationship History ...................................................................................................... 17

      Basis for Counterclaim .................................................................................................. 18

        Psychological Abuse ................................................................................................. 18

        Sexual Abuse ............................................................................................................ 20

        Physical Abuse .......................................................................................................... 21

        Stalking .................................................................................................................... 21

        University of Colorado Boulder Contact .................................................................. 25

        Posttraumatic Functioning ....................................................................................... 26

        Current Functioning ................................................................................................. 28

      Records Review ............................................................................................................. 30

        Tulane University ..................................................................................................... 30

        State of Louisiana ..................................................................................................... 30

      Medical History ............................................................................................................. 30

      Mental Health History ................................................................................................... 31

        Records Review: Dr. Allison Taylor ........................................................................ 31

i

ATTORNEYS' EYES ONLY- HIGHLY CONFIDENTIAL

EXHIBIT 2-2

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Records Review: Ms. Gwenn Lowe, LCSW ........................................................................ 31

Phone Interview: Ms. Gwenn Lowe .................................................................................... 32

Records Review: Dr. Lori Evans, Ph.D. ............................................................................. 34

Records Review: Dr. Benito Figueroa ................................................................................. 34

Alcohol and Drug History ............................................................................................................ 35

Collateral Interviews .................................................................................................................... 36

Deb Morel (Ms. Morel) ...................................................................................................... 36

Mike Shuster (Mr. Shuster) ................................................................................................ 37

Genevieve Shuster (Ms. G. Shuster) .................................................................................. 38

PSYCHOLOGICAL TEST DATA ...................................................................................................... 39

Adverse Childhood Experience Questionnaire .................................................................... 39

Beck Depression Inventory-2 .............................................................................................. 40

Beck Anxiety Inventory ....................................................................................................... 40

PTSD Checklist for DSM-5 with Criterion A ...................................................................... 41

Minnesota Multiphasic Personality Inventory-3 ................................................................. 41

Miller Forensic Assessment of Symptoms Test .................................................................. 42

Detailed Assessment of Posttraumatic Stress ..................................................................... 42

Trauma Symptom Inventory-2 ............................................................................................ 43

Personality Assessment Inventory ...................................................................................... 44

SUMMARY OF TESTING ................................................................................................................ 45

VI.   OPINIONS AND ANALYSIS ................................................................................................ 46

OPINION 1 ................................................................................................................................... 46

OPINION 2 ................................................................................................................................... 52

OPINION 3 ................................................................................................................................... 53

Emotional and Behavioral Functioning ............................................................................... 53

Social and Relationship Functioning ................................................................................... 54

Academic Functioning ......................................................................................................... 54

OPINION 4 ................................................................................................................................... 55

Individual Treatment ........................................................................................................... 55

Psychiatric Treatment .......................................................................................................... 57

Group Treatment .................................................................................................................. 58

Pulsed Interventions ............................................................................................................ 58

Academic Accommodations ................................................................................................ 58

SUMMARY AND PROGNOSIS ......................................................................................................... 58

APPENDIX A ............................................................................................................................... 61

DIAGNOSTIC CRITERIA ................................................................................................................ 62

Posttraumatic Stress Disorder (309.81) .............................................................................. 62

Major Depressive Disorder .................................................................................................. 64

APPENDIX B ............................................................................................................................... 65

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-3

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

REFERENCES ........................................................................................................................... 66

**APPENDIX C ....................................................................................................................... 69**

FEE SCHEDULE ...................................................................................................................... 69

**APPENDIX D ....................................................................................................................... 70**

RECENT EXPERT TESTIMONY SCHEDULE ............................................................................. 70

United States Military Courts Martial ............................................................................. 70

Depositions ...................................................................................................................... 70

Criminal Courts ............................................................................................................. 711

**APPENDIX E ....................................................................................................................... 71**

CURRICULUM VITAE .............................................................................................................. 72

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-4

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

| Name | Holly Shuster | Referral date | 09/15/2023 |
|---|---|---|---|
| DOB | 11/27/2002 | Interview date | 01/10 & 01/11/2024 |
| Examiner | Donna Peters, Psy.D. | Report date | 03/13/2024 |

# I.     Scope of Engagement

This document is my expert report in the matter of Jacob Levy v. Holly Shuster. I was retained in this matter by Attorneys Kimberly Hult and Dan Williams of Hutchinson, Black and Cook, LLC, on 09/15/2023, to conduct a forensic psychological evaluation of Holly Shuster. I have been asked to provide an expert opinion on the possible psychological effects and future impact of emotional, physical, and sexual abuse of the defendant and counterclaim plaintiff, Holly Shuster, by Jacob Levy that occurred during the relationship while both were students at Tulane University, and involved in a relationship. I was further asked to provide an opinion on the psychological impact of the stalking of Ms. Shuster by Mr. Levy after Ms. Shuster ended the relationship. I completed a conflict-of-interest check, and no conflicts were found.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-5

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# II.   Identifying   Information   and   Referral   for Evaluation

Ms. Shuster is a 21-year-old woman who was referred by counsel in this case to determine the existence and impact of possible psychological issues stemming from alleged emotional, physical, and sexual assaults by Mr. Levy. I am further asked to opine on the possible psychological impact of the stalking of Ms. Shuster by Mr. Levy following the end of the relationship.

## Case Summary

In August 2023, Mr. Levy filed a complaint alleging that he was emotionally, reputationally, and financially injured by false allegations of sexual assault and college expulsion levied at him by his former girlfriend, Ms. Shuster. In his complaint, Mr. Levy maintained that he and Ms. Shuster were involved in a relationship from November 2020 to October 2021 and lived together in an apartment for a period of time. Mr. Levy detailed in his complaint that he and Ms. Shuster had a consensual sexual relationship until October 2021, when the relationship ended. Mr. Levy stated that he agreed to leave the school as part of a mutual No Contact Order issued by Tulane University. Mr. Levy purported that after leaving Tulane University, he eventually enrolled at Front Range Community College with plans to transfer to the University of Colorado Boulder. He reported that he pledged to a fraternity at the University of Colorado Boulder in August 2022, and his pledge was accepted by the fraternity. Mr. Levy contended that in September 2022, Ms. Shuster caused some text messages to be sent to the fraternity social chairs alleging that Mr. Levy had emotionally, physically, and sexually assaulted Ms. Shuster during their relationship. Mr. Levy submitted that he was terminated from the fraternity secondary to the text messages and was forced to leave school after others around the school "bullied" and "ostracized" him (First Amended Complaint and Jury Demand).

Mr. Levy claims the following (First Amended Complaint and Jury Demand):

1. First Cause of Action: Defamation *per se* and *per quod*

2. Second Cause of Action: Intrusion on seclusion

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-6

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

   3.   Third Cause of Action: Unreasonable disclosure of private facts

Ms. Shuster filed several counterclaims detailing that Mr. Levy emotionally, sexually, and physically abused her on multiple occasions over the course of the relationship. Ms. Shuster indicated that after the ending of the relationship in late October or early November 2021, Mr. Levy stalked her through repeated text messages and phone calls, accessed her social media accounts, and broke into her dormitory room. She reported the stalking behavior to Tulane University officials and received a mutual No Contact Order. Ms. Shuster contended that Mr. Levy continued to stalk her, and she sought a Petition for Protection from a Louisiana state court. Ms. Shuster submitted that she was initially issued an Order of Protection and Temporary Restraining Order. The Court issued Consent Orders and a Permanent Injunction in February 2022.

Ms. Shuster asserted the following counterclaims (Answer to First Amended Complaint and Amended Counterclaims):

   1.   First Claim for Relief: Sexual Assault—Sexual Battery

   2.   Second Claim for Relief: Sexual Assault—Third-Degree Rape

   3.   Third Claim for Relief: Battery

   4.   Fourth Claim for Relief: Assault

   5.   Fifth Claim for Relief: Civil Stalking

   6.   Sixth Claim for Relief: Civil Cyberstalking

   7.   Seventh Claim for Relief: Violation of The Stored Communications Act, 18 U.S.C. § 2701, Et. Seq.

   8.   Eighth Claim for Relief: Intentional Infliction of Emotional Distress

   9.   Ninth Claim for Relief: Violation of Louisiana Civil Code Article 2315

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-7

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## III.  Method of Evaluation

### Process and Scope of the Evaluation

In forming my opinions in this case, I conducted a full psychological evaluation of Ms. Shuster. I analyzed all information provided to me regarding Ms. Shuster, including but not limited to (1) identifying information, (2) psychosocial history (education, living situation, occupational history, religious affiliation, medical and mental health history, etc.), (3) details of the alleged intimate partner violence, subsequent stalking and the perceived emotional impact, (4) collateral interview with Gwenn Lowe (treating therapist), (5) collateral interview with Deb Morel (mother), (6) collateral interview with Michael Shuster (father), (7) collateral interview with Geneieve Shuster (sister), and (8) administration of psychological evaluations pertinent to the assessment questions. I also considered alternative explanations for Ms. Shuster's past and present psychological struggles in formulating my opinions.

### Documents Reviewed

- First Amended Complaint and Jury Demand
- Answers to First Amended Complaint and Amended Counterclaims
- Minute Order
- Non-Disclosure Agreement
- Dr. Benito Figueroa: Mental health records
- Dr. Allison Taylor: Mental health records
- Dr. Lori Evans: Therapy records
- Gwenn Lowe: Medical records
- Gwenn Lowe: Psychotherapy notes
- Holly Shuster 0000001-0000002
- Holly Shuster 0000004-0000012
- Holly Shuster 0000013-0000021
- Holly Shuster 0000022-0000022
- Holly Shuster 0000075
- Holly Shuster 0000112-0000113

7

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-8

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Holly Shuster 0000115
- Holly Shuster 0000382-0000388
- Holly Shuster 0001963-0001975
- Holly Shuster 0002122-2000123
- Holly Shuster 0002205
- Holly Shuster 0002481-0002482
- Holly Shuster 0002525
- Holly Shuster 0003302
- Holly Shuster 0003315
- Holly Shuster 0003317-0003318
- Holly Shuster 0003320-0003321
- Holly Shuster 0003325
- Holly Shuster 00409909
- Holly Shuster 00388670
- Holly Shuster 00332044
- Holly Shuster 00344155
- Holly Shuster 00345841
- Holly Shuster 00403898
- Holly Shuster 00350398
- Holly Shuster 00481545
- Holly Shuster 00481544
- Holly Shuster 00393842
- Holly Shuster 00388672
- Jacob Levy 0000522-0000527
- Jacob Levy 0000533-0000547
- Jacob Levy 0000561-0000565
- Tulane 0000045-0000049
- Tulane 0000229

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-9

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

### Interviews and Consultations

- Clinical interview/testing with Holly Shuster (7.0 hours)    01/10/2024
- Clinical interview/testing with Holly Shuster (7.0 hours)    01/11/2024
- In-person interview with Deb Morel (1.0 hour)    01/10/2024
- Phone interview with Michael Shuster    02/03/2024
- Phone interview with Genna Shuster    02/03/2024
- Phone consult with Gwenn Lowe    02/09/2024

### Psychological Measures and Testing (Given in the order listed on 01/10/2024 and 01/11/2024)

- Adverse Childhood Experience (ACE) Questionnaire
- Life Events Checklist for DSM-5
- Domestic Violence Checklist
- Beck Depression Inventory-2 (BDI-2)
- Beck Anxiety Inventory (BAI)
- PTSD Checklist (PCL-5) with Criterion A
- Minnesota Multiphasic Personality Inventory-3 (MMPI-3)
- Miller Forensic Assessment of Symptoms Test (M-FAST)
- Detailed Assessment of Posttraumatic Stress (DAPS)
- Trauma Symptom Inventory-2 (TSI-2)
- Personality Assessment Inventory (PAI)

## Preparation of Participants

For all participants contacted concerning this evaluation, I identified myself, my professional role in the case, the purpose of the evaluation, and the non-confidential nature of the information obtained. I informed Ms. Shuster that I was retained by her attorneys and would be performing an assessment to determine the possible psychological impact of various forms of intimate partner violence and stalking. I explained that the results of my interview with her, the review of documentary evidence, and the results of the tests could be used in a written report that would be shared with opposing attorneys and others involved in her civil case. Ms. Shuster signed consent outlining these issues. Ms. Shuster

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-10

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

agreed to discontinue the testing if, at any time, she felt she was not able to put forth her best effort in the test. Ms. Shuster verbalized her understanding of the consent form as follows: "Everything I say will be laid bare. I am happy to have another opportunity to get my story out there. It [my story] can go to my lawyers and other lawyers. This is not a therapeutic process. You have to report suicidal information and homicidal threats."

10

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-11

11

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-12

12

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-13

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-14

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-15

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-16

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Legal History

Ms. Shuster has never been arrested and has no history of criminal behavior. She is her own legal guardian.

## Relationship History

Ms. Shuster recounted that she dated in high school and had a one-year relationship that ended during COVID-19. She noted that the relationship ended because it was difficult to maintain during the pandemic and subsequent shutdown. Ms. Shuster recalled that the relationship was not serious and ended on amicable terms. She submitted that she had never experienced any form of aggression or intimate partner violence in that relationship.

Ms. Shuster shared that she met Jacob Levy at Tulane University in August 2020. She indicated that she was introduced to Mr. Levy by her roommate at the time. She maintained that when she met Mr. Levy, she was interested in another student, Mr. Grove, and did not see Mr. Levy again until she contracted COVID-19 and was quarantined at a nearby hotel, as was Tulane's policy. Ms. Shuster contended that while quarantined, several Tulane students who were all quarantined at the hotel started a group chat, and Mr. Levy was one of those students. She described that Mr. Levy reached out to her through this group chat and invited her to his room, where other students were also expected to meet. Ms. Shuster reported that when she arrived at Mr. Levy's room, no other students were present, and no one else showed up.

Ms. Shuster stated that she and Mr. Levy drank wine and, during the course of the evening, had consensual sex. Ms. Shuster continued that she returned to her hotel room to sleep that night. She detailed that Mr. Levy texted her multiple times following that night, and she ignored his text messages. She explained that she would see Mr. Levy at social gatherings, as she and Mr. Levy shared mutual friends. ). She recounted that Mr. Levy tried to convince her to date him instead, asserting that he would treat her well.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-18

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Basis for Counterclaim

The following information is organized into types or categories of intimate partner violence for ease of understanding and is not a timeline of events. Due to the number of incidents reported, the following is not an exhaustive description of all incidents but is rather a summary of the most salient events as determined by Ms. Shuster.

### Psychological Abuse

Ms. Shuster noted that over the course of her relationship with Mr. Levy, he repeatedly emotionally abused her. She recalled that the first occasion of emotional abuse occurred in October 2020 when Mr. Levy found out she was dating Mr. Grove and called her a "whore." Ms. Shuster submitted that Mr. Levy acted as though she had hurt him even though they were not involved in a relationship at the time. She expressed that Mr. Levy told her that people were gossiping about her. She shared that in that moment, she felt bad about herself. She disclosed that Mr. Levy told her he cared about her and did not listen to gossip. Ms. Shuster indicated that she and Mr. Levy began dating at that time.

Ms. Shuster maintained that during the relationship with Mr. Levy, she lost all sense of herself. She described that she had stopped trusting herself. She reported that she felt as though she was constantly disappointing Mr. Levy. She reported that Mr. Levy called her disparaging names, including "whore," "slut," and "stupid." Ms. Shuster stated that Mr. Levy would tell her, "You are such a child," and, "You make stupid decisions." She continued that at that time, she began to experience significant anxiety. She explained that she had anxiety in high school prior to the relationship and ranked this anxiety as 5 on a 10-point scale, where 10 is the most severe. She added that at the time of her relationship with Mr. Levy, her anxiety increased to an 8 or 9, with 10 being the most severe.

Ms. Shuster related that Mr. Levy went through her cell phone and looked at her messages. She recounted that Mr. Levy would access her social media accounts while she was sleeping. She recalled that upon awakening, she would notice she was logged out of her social media accounts when she had not logged out before falling asleep.

A review of text messages between Ms. Shuster and Mr. Levy on 12/17/2020 indicated that Mr. Levy asked for Ms. Shuster's Snapchat password. Ms. Shuster initially refused to

18

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

give Mr. Levy the password but eventually gave it to him after multiple back-and-forth texts (Bates 0001963-0001975).

Ms. Shuster submitted that Mr. Levy threatened suicide on several occasions during the relationship, with the first threat in October 2021. She shared that on these occasions, Mr. Levy would tell her that the only reason he did not kill himself was because of her. She disclosed that she feared Mr. Levy would hurt himself if she left. She indicated that it seemed that Mr. Levy had "no motivations outside of her."

Ms. Shuster detailed that Mr. Levy controlled her time with friends. She maintained that Mr. Levy would tell her that her friends were gossiping about her, and she began spending less time with friends and more time with Mr. Levy. She contended that it was easier to just be with Mr. Levy, as he was always concerned that she was saying negative things about him to her friends. Ms. Shuster described that Mr. Levy moved into her dorm room with her, and she started to miss classes and assignments to be with him. She reported that at that point, the relationship was not healthy, and her anxiety was increasing due to Mr. Levy's increasingly controlling behavior. She also stated that COVID-19 and remote learning were factors in her declining grades at that time. Ms. Shuster explained, "Everything was about pleasing him." She continued that she stopped communicating with her family as often as before because she feared they would notice something was wrong. She admitted that she loved Mr. Levy and did not want to lose him at that point in the relationship.

Ms. Shuster purported that Mr. Levy told her how to dress and would become upset if she wore anything "revealing." She remarked that Mr. Levy would tell her, "That is not how girls with boyfriends dress." She added that Mr. Levy became upset if she talked with other guys at a social gathering and would call her a "slut." Ms. Shuster related that she would feel guilty after Mr. Levy became upset, and she began to avoid situations or social gatherings where other males would be present.

Ms. Shuster recounted that Mr. Levy would become so angry with her at times that she feared him. She noted that Mr. Levy would scream, yell, and berate her. She recalled that Mr. Levy would then have periods of being loving and kind and would apologize for his

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-20

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

behavior. Ms. Shuster admitted that she believed Mr. Levy and hoped the loving behavior would continue.

Ms. Levy submitted that she and Mr. Levy went to their separate homes during the summer break of 2022. She shared that Mr. Levy called her daily and would become upset if she did not immediately answer his calls or texts, texting multiple times in a row until she answered. She indicated that Mr. Levy would ask for her work schedule so he knew where she was. Ms. Shuster maintained that she allowed Mr. Levy to track her phone through Life 360, and he would call or text her asking her why she was at a particular location at any time. She contended that it felt as though Mr. Levy was her "parent" and that he had all the power in the relationship.

**Sexual Abuse**

Ms. Shuster described that Mr. Levy repeatedly engaged in coercive sexual assault during the relationship. She reported that Mr. Levy pressured her to comply with his desire for sex and would ask for sex repeatedly until she gave in. Ms. Shuster stated that there were many verbal arguments around sex in the relationship. She continued that if she said "No," Mr. Levy would berate her, telling her that something was wrong with her sexually or accusing her of not loving him and being interested in someone else. She explained that this pressure and coercion occurred daily during the relationship. Ms. Shuster remarked that, at times, she cried and stared at the ceiling during sex, as it was painful. She added that if she refused to have sex, Mr. Levy would masturbate and ejaculate on her. She related that she would feel relieved when Mr. Levy ejaculated, as that meant he would leave her alone. She recounted that there were many times she would give up and just agree to sex, as it was easier.

Ms. Shuster noted that Mr. Levy was aggressive during sex and wanted her to act like she enjoyed it. She recalled that he would hit her with an open hand in the face, chest, and thigh area. She submitted that Mr. Levy "choked" her by applying pressure to the front of her throat with his hand. She shared that this had happened on more than one occasion, and she would ask him not to squeeze her neck. She disclosed that there were times when she could not breathe, but she experienced no loss of consciousness. Ms. Shuster indicated that if she told Mr. Levy to stop squeezing her neck, he would only stop after she really

20

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

struggled. She maintained that she would panic, thinking Mr. Levy would not stop. She contended that Mr. Levy would tell her it was okay and that "this is what adult relationships are like." Ms. Shuster described that she tried to avoid having sex with Mr. Levy to avoid the choking incidents.

Ms. Shuster reported that there were times when she would wake up and Mr. Levy was digitally penetrating her or masturbating on her. She stated that at those times, she had been asleep and had not given Mr. Shuster permission to have sex or engage in sexual activities with her while she was sleeping. She continued that Mr. Levy took videos of her on his phone during sex. She explained that sometimes she knew he was recording, and sometimes she did not. Ms. Shuster remarked that after sex, Mr. Levy would show her the videos. She added that, to her knowledge, Mr. Levy did not post the videos anywhere but would talk about sharing them with his friends. She related that Mr. Levy told her she was "lucky" to have a boyfriend who would never show the videos to anyone.

Ms. Shuster recounted that over the summer of 2022, while home with her family, she sexted/texted Mr. Levy about having rough sex and the things she wanted him to do to her sexually. She noted that she texted these comments because she wanted to please Mr. Levy, knowing he enjoyed this type of conversation. Ms. Shuster conveyed that she wanted to make Mr. Levy happy. She recalled that it was easier to say these things in text messages when she was home with her family in New York, as she knew she would not have to follow up or do anything sexual with Mr. Levy.

**Physical Abuse**

In addition to the hitting and choking during sexual interactions, Ms. Shuster submitted that Mr. Levy pushed her on several occasions during an argument. She expressed that Mr. Levy would push her with both his hands against her chest or by sweeping his arm out and against her body.

**Stalking**

Ms. Shuster shared that she broke up with Mr. Levy three times over four days in early November 2021. She disclosed that at that time, she and Mr. Levy were no longer living together, and she was able to get some separation from the relationship. She indicated that she started wondering if she was the problem in the relationship or if it was Mr. Levy. She

21

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

maintained that she still loved Mr. Levy at that time but no longer wanted to be with him, given his treatment of her. Ms. Shuster contended that she moved into a dormitory building that had key access only, and this made her feel safe enough to end the relationship.

Ms. Shuster described that she told Mr. Levy she wanted a break from the relationship but that maybe they could be together again in the future. She detailed that Mr. Levy became upset and accused her of wanting to be with other men. She reported that she apologized to Mr. Levy due to his intense anger. Ms. Shuster stated that at that time, Mr. Levy turned around and said, "No, I am ending the relationship." She continued that Mr. Levy called her multiple times, asking if they could get back together. Ms. Shuster acknowledged that at that time, she decided she wanted the relationship to be over.

Ms. Shuster explained that Mr. Levy showed up at her dormitory repeatedly following the breakup. She recounted that Mr. Levy showed up outside of her dormitory between 10 and 20 times. She noted that he would sometimes stand outside and yell her name when she came out of the dormitory. Ms. Shuster recalled that Mr. Levy would appear outside her dormitory at night and watch her when she came outside to be picked up by one of her friends. She submitted that she never said anything to Mr. Levy during these times. She shared that she started to panic because of how many times Mr. Levy showed up at her dormitory. She disclosed that, at that time, Mr. Levy could not have known her schedule. She indicated that she suspected he was waiting and watching outside.

Ms. Shuster maintained that she would sometimes see Mr. Levy when she was out in public. She contended that on one occasion, she was at a popular bar with friends, and Mr. Levy was there and attempted to touch and grab her arm. She described that she panicked and moved away from him. She reported that this happened approximately twice after the No Contact Order was put into place.

Ms. Shuster stated that Mr. Levy continued to text her multiple times a day. She continued that the text and phone messages from Mr. Levy were initially friendly but quickly progressed to anger and desperation. Ms. Shuster explained that she was frightened by his words, "We are meant to be together" and "You are going to regret this someday." She remarked that she felt Mr. Levy was "off the rails" and that he could potentially do

ATTORNEYS' EYES ONLY- HIGHLY CONFIDENTIAL

EXHIBIT 2-23

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

something to her or himself. She added that she initially tried to answer him, as she still loved him and felt compassion for him, questioning whether she should be helping him.

A review of the text messages between 11/05/2021 and 11/16/2021 evidenced multiple messages sent by Mr. Levy to Ms. Shuster. On 11/09/2021, Mr. Levy sent approximately 147 text messages to Ms. Shuster. The text messages appeared to be increasingly desperate in tone over time. The texts indicated that Mr. Levy was vacillating between desperation and anger. In one text, Mr. Levy wrote, "You have stood me up and blown me off and ignored me for the last time." Later in the text chain, Mr. Levy stated, "I am on hold with the crisis line." "I just want to talk." "I am not doing well." (Bates 0002282).

One of the most upsetting incidents occurred on or around November 3, 2021. Ms. Shuster noted that Mr. Levy came to her dormitory room while she was out. She recalled that she and her roommate never locked their dormitory room door, as the building was secure and a keycard was needed to gain entry. She submitted that she returned to her dormitory room to find Mr. Levy lying on her bed, appearing as though he had been crying. She shared that her room was in disarray, and things had been moved. Her roommate, Liberty, was very upset and scared.

Ms. Shuster disclosed that she asked Mr. Levy to go with her to the common room so that she could get him out of the room. She mentioned that Mr. Levy appeared intoxicated, as he was slurring his words. She indicated that Mr. Levy was screaming and yelling at her, asking her where she had been and who she had been with. She maintained that at that time, Mr. Levy had pulled off a heavy ring he was wearing and threw it at her face. She contended that she ducked out of the way, but she became very frightened at that time. She described that she and Mr. Levy moved to the outside balcony area, as other students could hear him screaming at her, and she wanted to calm him down. Ms. Shuster reported that once outside, Mr. Levy grabbed her by both shoulders and pushed her against the balcony railing, with her back hitting the railing. She stated that Mr. Levy asked her, "Do you think I will push you?" Ms. Shuster continued that she feared Mr. Levy would push her and she would fall four floors to the ground. She explained that Mr. Levy released her, and she started crying. She remarked that she ran back to her dormitory room and locked the door. She added that when she returned to her room, she found a letter on her bed from Mr. Levy.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-24

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

On another night, Ms. Shuster related that Mr. Levy showed up at her dormitory room and pounded on the door when Ms. Shuster was not there, terrifying her roommate. She shared that Mr. Levy would stand outside her dorm building, and she never knew when he would be there. She disclosed that she became afraid of leaving her dormitory alone. She indicated that Mr. Levy sent her a message on December 21, 2021, asking her to meet him at the top of a parking structure near her dormitory. She maintained that the message was threatening in nature, demanding that she meet him at the parking structure "or else." She contended that she feared for her safety and experienced sleep problems and nightmares.

Ms. Shuster purported that she was on academic probation and was assigned a case manager, Deanna Robertson. She described that she disclosed Mr. Levy's stalking behavior to a case manager, who assisted her in obtaining a No Contact Order. Ms. Shuster reported that even after the No Contact Order, Mr. Levy continued to direct message her on Instagram and leave voice messages that were sometimes sad and sometimes threatening. Ms. Shuster explained that she called campus police to report a violation of the No Contact Order and eventually got an Order of Protection from the state of Louisiana after speaking with her attorney.

Ms. Shuster remarked that she did not include the accusations of sexual assault when she asked for the No Contact Order and Order of Protection. She added that she did not want to disclose any details of the sexual abuse and only reported the stalking behavior by Mr. Levy. She related that at that time, she doubted herself and still had compassion for Mr. Levy. She said, "This was a big deal, and it was my fault for not reporting it at this time." Ms. Shuster recounted that she did not believe that her sexual assaults fit the definition of rape. She noted that she did not feel as though she deserved to use the term rape or sexual assault. Ms. Shuster recalled that her definition of rape was being physically restrained or incapacitated. She submitted that she questioned whether the assaults were her fault and if there was something wrong with her. Ms. Shuster expressed that at the time, she thought Mr. Levy had a right to have sex with her, as the two of them were in a relationship. She shared that Mr. Levy sexually assaulted her multiple times, and she let him. Ms. Shuster disclosed that reporting the sexual assault at this time was too much, and she could not talk about it. She indicated that it took her a while to realize that Mr. Levy's behaviors were, in fact, sexual assault.

24

EXHIBIT 2-25

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Ms. Shuster believed that Mr. Levy continued to violate the No Contact Order and the Order of Protection on several occasions by either contacting her directly or through his or her friends. She contended that she sometimes received calls from a number with no caller identification and believed it was Mr. Levy.

A review of email correspondence between Mr. Levy and Brad Browning (relationship, breakup and divorce coach), dated 12/16/2021, indicated that Mr. Levy contacted Ms. Shuster. Mr. Levy wrote in an email, "So today, I caved and reached out to Holly" (JL 0522).

**University of Colorado Boulder Contact**

Ms. Shuster described that approximately six months after Mr. Levy left Tulane University, she discovered he was attending a school in Colorado. She reported that she was angry and felt that Mr. Levy was a danger. Ms. Shuster stated that her friend had sent her a TikTok video of Mr. Levy at a fraternity get-together. She continued that it worried her that Mr. Levy might sexually assault another girl. She explained that she felt Mr. Levy being in a fraternity presented a higher risk for assaulting someone else, as her impression of fraternities includes a lot of parties with young females. Ms. Shuster remarked that, to her, being in a fraternity meant that Mr. Levy had more power over potentially vulnerable females.

Ms. Shuster related that her friend, Claire Arnold, suggested that she contact the fraternity in Colorado. Months earlier, Ms. Shuster recounted that she had prepared an outline/letter for herself to have a timeline of events with Mr. Levy. She noted that this letter was given to Ms. Arnold, who then contacted the president of the fraternity at the University of Colorado Boulder. Ms. Shuster recalled that her identity was not included in the letter. She submitted that the fraternity asked Ms. Arnold for a copy of the Order of Protection order, and Ms. Shuster supplied it to Ms. Arnold. Ms. Shuster expressed that she redacted names from the letter, as she was still very afraid of Mr. Levy, but she thought it was important that he not be allowed to join a fraternity. She shared that she thought what she did was a good thing, and she felt an obligation to protect others. She disclosed that at that time, she did not think she was doing anything wrong.

25

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Ms. Shuster indicated that after Mr. Levy was asked to leave the fraternity, he filed a civil case against her, demanding a full retraction of her allegations of sexual assault. She said that she could not say it did not happen and it was not untrue. She stated, "This is my story, and I have a right to be honest."

Of the relationship, Ms. Shuster contended that she stayed in the relationship with Mr. Levy as long as she did because she cared about him. She described that Mr. Levy was alternately kind and abusive and would turn from being mean to being her comforter. She reported that she believed no one understood him as she did. She stated that she justified his behavior.

Ms. Shuster continued that she did not tell her parents about the abuse during the relationship, as she feared they would tell her to get out of the relationship, and she did not want to end the relationship at that time. She explained that she did not want to face the fact that she was in an abusive relationship.

**Posttraumatic Functioning**

Posttraumatic distress is an individual's response to the index trauma in the days, weeks, months, or years following the trauma. It includes the functional impact or impairment experienced in multiple areas of an individual's life, including emotional and behavioral, social and relational, academic, and leisure.



ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-27

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-28

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-29

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-30

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Records Review

### Tulane University

11/16/2021: Records indicate that Tulane University issued a mutual No Contact Order between Ms. Shuster and Mr. Levy.

12/10/2021: Ms. Deanna Robertson, case manager, recorded a violation of the No Contact Order by Mr. Levy. It was noted that Mr. Levy contacted Ms. Shuster via social media and showed up at Ms. Shuster's dormitory building, shouting her name when she exited her building. Ms. Shuster supplied text messages from Mr. Levy that were sent after the No Contact Order was in place. Records indicate that Ms. Robertson discussed a safety plan with Ms. Shuster (Bates 00388670).

12/17/2021: Ms. Robertson recorded that Ms. Shuster supplied a screenshot of a message from Mr. Levy asking to meet Ms. Shuster at the parking structure at 3:00 pm.

### State of Louisiana

01/24/2022: Ms. Shuster filed a Petition for Protection from Abuse. She endorsed that Mr. Levy shoved, stalked, threatened, and harassed her. Ms. Shuster did not check the sexual abuse box on the form (Bates 0000004-0000012).

01/25/2022: The Louisiana Civil District Court issued an Order of Protection (Bates 0000013-0000021).

02/14/2022: Ms. Shuster filed a Consent Order and Injunction with the state of Louisiana (Bates 0000022-0000024).

02/23/2022: The state of Louisiana issued a Permanent Injunction.



30

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-32

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-33

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-34

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-35

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-37

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-38

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL                                    EXHIBIT 2-39

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-40

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-41

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-42

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-43

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-44

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-45

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-47

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-48

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-49

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-50

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-51

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-52

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-53

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-54

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-55

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-56

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-57

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-58

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-59

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-60

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-61

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

*The opinions offered in this report are based on a reasonable degree of psychological certainty, and the opinions provided above may change with the provision of additional information.*

If I may be of further service in this matter, please do not hesitate to contact me.

Respectfully submitted,

Donna Peters, Psy.D.

Licensed Clinical Forensic Psychologist

61

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-62

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# Appendix A

## Diagnostic Criteria

### Posttraumatic Stress Disorder (309.81)

A.  Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:

   1) Directly experiencing the traumatic event(s)

   2) Witnessing, in person, the event(s) as it occurred to others

   3) Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental.

   4) Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains or police officers repeatedly exposed to details of child abuse)

B.  Presence of one (or more) of the following intrusive symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:

   1) Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s)

   **Note:** In children older than six years, repetitive play may occur in which themes or aspects of the traumatic event(s) are expressed.

   2) Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s)

   **Note**: In children, there may be frightening dreams without recognizable content.

   3) Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.

   **Note:** In children, trauma-specific reenactment may occur in play.

   4) Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s)

ATTORNEYS' EYES ONLY- HIGHLY CONFIDENTIAL

EXHIBIT 2-63

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

    5) Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s)

C. Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:

    1) Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s)

    2) Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, or situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s)

D. Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

    1) Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia and not to other factors such as head injury, alcohol, or drugs)

    2) Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., I am bad, no one can be trusted, the world is completely dangerous, or my whole nervous system is permanently ruined)

    3) Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others

    4) Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame)

    5) Markedly diminished interest or participation in significant activities

    6) Feelings of detachment or estrangement from others

    7) Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings)

E. Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

    1) Irritable behavior and angry outbursts (with little or no provocation), typically expressed as verbal or physical aggression toward people or objects

    2) Reckless or self-destructive behavior

Appendix A

**Diagnostic Criteria**

63

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-64

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

   3)  Hypervigilance

   4)  Exaggerated startle response

   5)  Problems with concentration

   6)  Sleep disturbances (e.g., difficulty falling or staying asleep or restless sleep)

F.  The duration of the disturbance (criteria B, C, D, and E) is more than one month.

G.  The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

H.  The disturbance is not attributable to the physiological effects of a substance (e.g., medication or alcohol) or another medical condition.

**Dissociative symptoms:** Specify if the individual's symptoms meet the criteria for PTSD, and in addition, in response to the stressor, the individual experiences persistent or recurrent symptoms of either of the following:

a.  **Depersonalization:** Persistent or recurrent experiences of feeling detached from and as if one were an outside observer of one's mental processes or body (e.g., feeling as though one were in a dream or feeling a sense of unreality of self or body or of time moving slowly).

b.  **Derealization:** Persistent or recurrent experiences of unreality of surroundings (e.g., the world around the individual is experienced as unreal, dreamlike, distant, or distorted).

**Note:** To use this subtype, the dissociative symptoms must not be attributable to the physiological effects of a substance (e.g., blackouts or behavior during alcohol intoxication) or another medical condition (e.g., complex partial seizures).

**Delayed expression:** Specify if the full diagnostic criteria are not met until at least six months after the event (although the onset and expression of some symptoms may be immediate).

## Major Depressive Disorder (296.32)

A.  Five (or more) of the following symptoms have been present during the same two-week period and represent a change from previous functioning, and at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-65

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

1) Depressed mood most of the day nearly every day as indicated by either subjective report (e.g., feels sad or empty) or observation made by others (e.g., appears tearful)

2) Markedly diminished interest or pleasure in all, or almost all, activities most of the day nearly every day (as indicated by either subjective account or observation made by others)

3) Significant weight loss when not dieting or weight gain (e.g., a change of more than 5% of body weight in a month) or decrease or increase in appetite nearly every day

4) Insomnia or hypersomnia nearly every day

5) Psychomotor agitation or retardation nearly every day (observable by others, not merely subjective feelings of restlessness or being slowed down)

6) Fatigue or loss of energy nearly every day

7) Feelings of worthlessness or excessive or inappropriate guilt (which may be delusional) nearly every day (not merely self-reproach or guilt about being sick)

8) Diminished ability to think or concentrate or indecisiveness nearly every day (either by subjective account or as observed by others)

9) Recurrent thoughts of death (not just fear of dying), recurrent suicidal ideations without a specific plan, or a suicide attempt or specific plan for committing suicide

B. The symptoms do not meet the criteria for a mixed episode.

C. The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D. The symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse or a medication) or a generalized medical condition.

E. The symptoms are not better accounted for by bereavement, and the symptoms persist for longer than two months or are characterized by marked functional impairment, morbid preoccupation with worthlessness, suicidal ideation, psychotic symptoms, or psychomotor retardation.

Appendix A

**Diagnostic Criteria**

65

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-66

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# Appendix B

## References

In addition to my 25 years of experience working in the field of trauma and trauma-related response, reviewing hundreds of scientific articles and books, and participating in numerous workshops, the following articles were reviewed as part of this evaluation.

Abbey, A., BeShears, R., Clinton-Sherrod, A. M., & McAuslan, P. (2004). Similarities and differences in women's sexual assault experiences based on tactics used by the perpetrator. *Psychology of Women Quarterly*, 28, 323−332.

Banyard, V. L., Demers, J. M., Cohn, E. S., Edwards, K. M., Moynihan, M. M., Walsh, W. A., & Ward, S. K. (2020). Academic correlates of unwanted sexual contact, intercourse, stalking, and intimate partner violence: An understudied but important consequence for college students. *Journal of Interpersonal Violence*, *35*(21–22), 4375–4392.

Breitenbecher, K. H. (1999). The association between the perception of threat in a dating situation and sexual victimization. *Violence and Victims*, 14, 135−146.

Brown, A., Testa, M., & Messman-Moore, T. (2009). Psychological consequences of sexual victimization resulting from force, incapacitation, or verbal coercion. *Violence Against Women*, *15*(8), 898–919.

Churcher, F., & Nesca, M. (2013). Risk Factors for Violence in Stalking Perpetration: A Meta-Analysis. *Journal of Social Sciences*, 7, 100–112.

Davis, K. E., Coker, A. L., & Sanderson, M. (2002). Physical and mental health effects of being stalked for men and women. *Violence and Victims*, *17*(4), 429–443.

Diette, T. M., Goldsmith, A. H., Hamilton, D., Darity Jr, W., & McFarland, K. (2014). Stalking: Does it leave a psychological footprint? *Social Science Quarterly*, *95*(2), 563−580.

Edwards, K. M., & Gidycz, C. A. (2014). Stalking and psychosocial distress following the termination of an abusive dating relationship: A prospective analysis. *Violence Against Women*, *2011*, 1383−1397.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-67

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Franklin, C. (2010). Physically forced, alcohol-induced, and verbally coerced sexual victimization: Assessing risk factors among university women. *Journal of Criminal Justice*, 149–159.

Gilmore, A., Schact, R., George, W., Davis, K., Norris, J. & Heiman, J. (2014). Verbal sexual coercion experiences, sexual risk, and substance use in women. *Journal of Aggression, Maltreatment and Trauma*, 23, 725–739.

Jordan, C. E., Combs, J. L., & Smith, G. T. (2014). An exploration of sexual victimization and academic performance among college women. *Trauma, Violence, & Abuse*, *153*, 191–200.

Katz, J., & Rich, H. (2015). Partner covictimization and post-breakup stalking, pursuit, and violence: A retrospective study of college women. *Journal of Family Violence*, *30*(2), 189–199.

Krebs, C. P., Lindquist, C. H., Warner, T. D., Fisher, B. S., & Martin, S. L. (2007). *The campus sexual assault (CSA) study*. Washington, DC: National Institute of Justice, U.S. Department of Justice.

Katz, J., Moore, J., & Tkachuk S. (2007). Verbal sexual coercion and perceived victim responsibility: Mediating effects of perceived control. *Sex Roles,* 57:235–247.

Livingston, J. Buddie, A., Testa, M., & Tamsen, C. (2004). The role of sexual precedence in verbal sexual coercion. *Psychology of Women Quarterly*, 28, 287–297.

Logan, T. K., & Cole, J. (2007). The impact of partner stalking on mental health and protective order outcomes over time. *Violence and Victims*, *22*(5), 546–562.

Logan, T. K., & Cole, J. (2011). Exploring the intersection of partner stalking and sexual abuse. *Violence Against Women*, *17*(7), 904–924.

McGuire, B., & Wraith, A. (2000). Legal and psychological aspects of stalking: A review. *The Journal of Forensic Psychiatry*, *11*(2), 316–327.

Mechanic, M., Uhlmansiek, M., Weaver, T., & Resick, P. (2000). The impact of severe stalking by acutely battered women: An examination of violence, psychological symptoms and strategic responding. *Violence and Victims*, *15*(4), 443–458.

Appendix B
**References**

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-68

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Spitzberg, B. H., Marshall, L., & Cupach, W. R. (2001). Obsessive relational intrusion, coping, and sexual coercion victimization. *Communication Reports*, *14*(1), 19–30.

Storey, J., Pina, A. & Williams, C. (2023). The impact of stalking and its predictors: Characterizing the needs of stalking victims. *Journal of Interpersonal Violence,* 38, 11569–11594.

Tamborra, T., Dutton, L., & Terry, K. (2014). Verbally coerced sex: Does she have to say 'no?' *International Review of Victimology*, 227–241.

Testa, M., & Dermen, K. (1999). The differential correlates of sexual coercion and rape. *Journal of Interpersonal Violence*, 14, 548–561.

Tjaden, P. G., & Thoennes, N. (1998). *Stalking in America: Findings from the national violence against women survey* (pp. 1-20). Washington, DC: US Department of Justice Programs, National Institute of Justice.

Tyler KA, Hoyt DR, Whitbeck LG. (1998). Coercive sexual strategies. *Violence and Victims,* 47–61.

Zweig, J., Barber, B., Eccles, J. (1997). Sexual coercion and well-being in young adulthood: Comparisons by gender and college status. *Journal of Interpersonal Violence*. 1997; 12:291–308.

Appendix B

**References**

68

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-69

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Appendix C

### Fee Schedule

Services are furnished on an hourly basis at $450.00 per hour. This specifically includes (but is not limited to) researching, attending conferences, consulting with the client, reviewing documents, organizing documents, analyzing, testing, responding to discovery requests, writing reports, testifying, investigating, reading and signing deposition transcripts, traveling locally (portal-to-portal), waiting, preparing exhibits, preparing demonstrative aids, and preparing to testify at the deposition, trial, hearing, arbitration, and other venues. The expert's time will be tracked and invoiced to the nearest half an hour. In lieu of the above hourly rate, duties that reasonably require overnight travel will be billed at the flat rate of $5,000.00 per day on site. In any and all events, the client will be responsible for all reasonable out-of-pocket expenses, including, but not limited to, traveling, testing, researching, copying, and storing evidence or documents.

Appendix C
**Fee Schedule**
69

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-70

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# Appendix D

## Recent Expert Testimony Schedule

### United States Military Courts Martial

1) <u>United States v. Riley Cooper</u> (2019). Sexual assault by a member of the US Armed Forces. Testifying expert for the Government. Peterson AFB, Colorado.

2) <u>United States v. Joey Torres</u> (2019). Sexual assault by a member of the US Armed Forces. Testifying expert for the Government. Buckley AFB, Colorado.

3) <u>United States v. Charles Lisot</u> (2019). Sexual assault by a member of the US Armed Forces. Testifying expert for the Government. RAF Lakenheath, United Kingdom.

4) <u>United States v. Ryan Howard</u> (2019). Sexual assault by a member of the US Armed Forces. Testifying expert for the Government. Ramstein AFB, Germany.

5) <u>United States v. Tyrese Campbell</u> (2023). Domestic violence by a member of the US Armed Forces. Testifying expert for the Government. Ft. Bliss, Texas.

### Depositions

1) <u>De Groote v. University of Arizona</u> (2019). Intimate partner violence. Expert witness for the plaintiff victim.

2) <u>Moore v. Garland Crane</u> (2020). Sexual abuse of a child. Expert witness for the plaintiff parents of the child victim.

3) <u>Jane Doe v. Taos Municipal Schools et al.</u> (2022). Sexual assault on a public school campus. Expert witness for the plaintiff victim.

4) <u>Rebecca Baker v. Dr. Blayne McCaffrey and Norfolk Podiatry Center and Danelle Charf and Wanek Pharmacy</u> (2022). Mental health impact of an overdose prescription of Dilaudid that resulted in respiratory failure. Expert witness for the plaintiff.

5) <u>Robert Loera v. Kingsville Independent School District et al.</u> (2023). Sexual abuse of a child. Expert witness for the plaintiff victim.

6) <u>John Doe v. St. Johns Episcopal Church of Kissimmee, Inc.</u> (2023). Sexual abuse of a child. Expert witness for the plaintiff.

ATTORNEYS' EYES ONLY- HIGHLY CONFIDENTIAL

EXHIBIT 2-71

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

7) <u>Jane Doe v. Christopher Mauzy</u> (2023). Sexual assault. Expert witness for the plaintiff.

## Criminal Courts

1) <u>People of the State of Colorado v. Julian Santos-Campos</u>. Transfer waiver. Jefferson County District Court (2021). Expert witness for the defense in the area of the impact of domestic violence on child/adolescent development.

2) <u>People of the State of Colorado v. Connor Shaver</u>. Sexual assault. Boulder County Court (2021). Expert witness for the defense in the area of the impact of alcohol on memory and confabulation.

3) <u>People of the State of Colorado v. Jordon Miklos</u>. Sexual assault. El Paso County Court (2022). Expert witness for the prosecution in the area of the impact of alcohol on memory functioning and the neurobiological impact of trauma on memory.

4) <u>People of the State of Colorado v. Charles Higdon</u>. Sexual assault. Boulder County Court (2022). Expert witness for the defense in the area of the impact of alcohol-related blackouts on memory processes.

## Civil Courts

1) <u>Rebecca Baker v. Dr. Blayne H. McCaffrey et al</u>. District Court of Madison County, Nebraska (2023). Expert witness for the plaintiff in the area of the impact of overdose on psychological functioning.

2) <u>John Doe v. St. Johns Episcopal Church of Kissimmee, Inc.</u> (2024). Sexual abuse of a child. Expert witness for the plaintiff.

Appendix D

**Expert Testimony Schedule**

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-72

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# Appendix E

## Curriculum Vitae

| | |
|---|---|
| **Name** | Donna L. Peters |
| **Address** | 1720 S. Bellaire St., Ste 907 |
| | Denver, CO 80222 |
| **Telephone** | 303-594-7604 |
| **Fax** | 720-529-1557 |
| **E-mail** | drdonnapeters@yahoo.com |

**Education**

2003–2006   Doctorate in Clinical Psychology, Psy.D., University of Denver, Graduate School of Professional Psychology, APA-accredited program.
Concentration: _Forensic Assessment/Behavioral Analysis_.
Doctoral Dissertation: _Sexual Victimization and Risk for Revictimization._

2003–2005   M.A., University of Denver, Clinical Psychology.

1995–1998   M.Ed., University of Maryland, University College, Counseling and Personnel Services.
Thesis: _Factors Associated with Sexually Aggressive Attitudes and Behaviors_.

1990–1994   B.A., University of Maryland, University College, Asian Studies/Psychology.

**Professional Licenses/Certifications**

- Licensed Clinical Psychologist, CO-3153
- Certificate Program in Traumatic Stress Studies at the Trauma Center at Justice Resource Institute, Boston, MA
- Interjurisdictional Practice Certificate (IPC) and Temporary Authorization to Practice (TAP) from the PSYPACT Commission

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-73

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## **Professional Experience**

2006–Present   **Forensic Psychology Private Practice**

Conducting psychological and forensic assessments, including:

- Personality/cognitive functioning/traumatic brain injury (TBI)
- Trial competency
- Sentencing and mitigation
- Child abuse and neglect
- Domestic violence/intimate partner violence
- Malpractice
- Disability
- Re-sentencing
- Immigration relief
- Risk assessment/dangerousness
- Trauma assessments
- Personal injury and civil damages

Providing expert testimony and consultation services for both the prosecution/plaintiff and the defense/defendant in criminal, civil, military court martial, and federal immigration courts.

Expert content areas include:

- Psychological impact of sexual assault/abuse
- Intimate partner violence/domestic violence
- Post-assault victim response
- Neurobiological impact of trauma
- Posttraumatic Stress Disorder/symptoms
- Impact of alcohol on memory functioning/behavior
- Child pornography
- Impact of parental separation
- Human trafficking

Appendix E

**D. Peters CV**

73

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Torture/persecution

2005–Present **Forensic Psychological Evaluator:** Healthright International, Human Rights Clinic (formerly Doctors of the World)

- Conducting forensic evaluations with refugees from a variety of countries seeking asylum in the US.
- Determining the consistency of psychological sequelae with alleged experiences of persecution, torture, and sexual and other violence and reporting such findings in legal affidavits.
- Providing court testimony as an expert on the effects of trauma on psychological functioning.

2008–2016 **Forensic Examiner:** Denver Veteran's Administration Medical Center, Forensic Evaluator

- Conducted forensic assessments with returning combat veterans experiencing psychiatric injuries to determine the level of severity for service-connected disability
- Assessed conditions, including PTSD, mood disorders, substance use disorders, anxiety disorders, military sexual trauma, and TBI
- Developed legal affidavits that were used in the determination of government disability benefits
- Performed over 3,000 forensic evaluations/affidavits for the Veteran's Administration Review Board for legal case determination

2006–2009 **Director of Clinical Services:** Rape Assistance and Awareness Program (RAAP)

- Responsible for all aspects of the counseling department, including supervision of a large clinical staff, program development, community training, provision of expert testimony in sexual assault cases, and collection of statistics for grant funding purposes
- Provided direct clinical supervision for the trauma training program, which consisted of pre-doctoral and pre-master's students from a variety of mental health training programs

Appendix E

**D. Peters CV**

74

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-75

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Program Coordinator for the facility's APA-accredited predoctoral internship

2007–2008    **Psychological Evaluator:** Exempla West Pines Psychiatric Hospital

- Conducted psychological evaluations in emergency departments for the Exempla hospital network, including Saint Lutheran's Medical Center, Saint Joseph's Medical Center, and Good Samaritan Medical Center
- Evaluated psychiatric illness, suicidality, and chemical-dependency issues to determine the need for immediate patient hospitalization

2005–2006    **APA-Approved Doctoral Internship:** RAAP

- Conducted outpatient therapy on an 18-hours-per-week, clinically based rotation
- Conducted long- and short-term therapy, facilitated group therapy, conducted workshops and training in the area of sexual assault and trauma interventions, and supervised practicum students
- Provided in-house and community trainings on sexual assault issues
- Provided expert testimony in the areas of posttrauma victim response and trauma-related diagnoses

2004–2005    **Psychology Extern/Clinical Rotation:** Denver VA Medical Center, Substance Abuse Treatment Program

- Assessed substance-use issues for treatment and co-facilitated court-ordered groups for veterans charged with class-3–class-6 felonies, misdemeanors, or repeated alcohol/drug-related driving charges, as referred by the Veteran's Treatment Court

2003–2005    **Psychology Extern:** University of Denver, Professional Psychology Center

- Conducted forensic evaluations, including testamentary capacity, competency, and parental responsibility evaluations

Appendix E
**D. Peters CV**

75

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-76

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

**2003–2004**    **Psychology Extern/Clinical Rotation:** Kaiser Permanente, Behavioral Health Department

- Provided treatment services to children, adolescents, and adults with a wide range of presenting issues
- Conducted initial intake assessment, made a preliminary diagnosis, and provided the necessary ongoing short- or long-term therapy
- Participated in grand rounds with other Kaiser psychologists and psychiatrists

**2001–2002**    **Psychotherapist:** Memphis Sexual Assault Resource Center

- Provided treatment services for children, adolescents, adults, and affected family members with a recent or past history of sexual abuse or assault
- Served as the primary provider for children aged 5–12
- Conducted psychosocial evaluations and selected and implemented appropriate treatment interventions for an under-resourced population with a high degree of dual diagnosis
- Facilitated groups for adolescent survivors of sexual assault and adult survivors of childhood sexual abuse
- Trained sexual assault nurse examiner nursing students rotating through the agency as part of the University of Memphis nursing program

**1997–2001**    **Forensic Evaluator/Psychotherapist:** Army Behavioral Health, Torii Station, Okinawa, Japan

- Conducted forensic evaluations and risk assessments in both spousal- and child abuse allegations
- Facilitated groups for perpetrators of domestic violence, adult survivors of childhood sexual abuse, child witnesses of domestic violence, and children experiencing parental separation and divorce
- Provided after-hours crisis intervention for spousal- and child-abuse incidents, sexual assault, and combat-related trauma emergencies

Appendix E

**D. Peters CV**

76

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-77

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Worked closely with the Army Criminal Investigation Command in conducting forensic interviews with adults and children involved in violent incidents

**Teaching Experience**

Current      **Clinical Supervisor:** University of Denver, Graduate School of Professional Psychology, pre-doctoral students.  Provide consultation in forensic assessment and report writing to other psychologists.

2006–2017    **Clinical Supervisor:** Provided required supervision for state licensure for psychologists, advanced provider credentialing in EMDR therapy, and provider forensic evaluations addressing the influx of asylum seekers detained in Artesia, New Mexico, and Dilly, Texas

2006-2010    **Clinical Supervisor:** University of Denver, Graduate School of Professional Psychology, APA-approved internship for doctoral candidates

**Professional Organizations**

- Member: American Psychological Association
- Member: American Psychological Associate, Division of Trauma Psychology
- Member: American Psychology, Law Society
- Member: Healthright International, Human Rights Clinic, Volunteer Psychologist
- Rocky Mountain Immigrant Advocacy Network, Volunteer Psychologist in ICE detention cases

**Board Membership**

- Former Member of the Board of Directors, Rocky Mountain Immigrant Advocacy Network

**Editorial Activities**

- *Journal of Traumatic Stress*, ad-hoc reviewer

**Cross-Cultural Experiences**

Appendix E

**D. Peters CV**

77

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-78

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

1989–1991    Student visa, Japanese Language Institute: International Center of Language and Culture, Naha, Okinawa, Japan

2005–Present    Conducting forensic evaluations with individuals from over 40 countries

**Selected Trainings/Workshops**

- Conducting Forensic Evaluations Using Videoconferencing Technology, Randy Otto, Ph.D., ABPP & David Corey, Ph.D., ABPP.
- Forensic and Correctional Applications of the Personality Assessment Inventory, John Edens, Ph.D.
- Self-Regulation Deficits and Trauma in Psycholegal Settings, Jerrod Brown, Ph.D.
- MMPI-3 in Malingering Determinations, Martin Sellbom, Ph.D.
- Introduction to Using the MMPI-3 in Psychological Practice, Martin Sellbom, Ph.D.
- Psychological Evaluation of Causation and Damages in Personal Injury Cases, William Foote, Ph.D., ABPP.
- Adverse Childhood Experiences (ACEs) in the Criminal Justice System, Jerrod Brown, Ph.D.
- Advanced Training in Traumatic Brain Injury (TBI), Jerrod Brown, Ph.D.
- MMPI-3 for Forensic Psychologists, Yossef Ben-Porath, Ph.D., ABPP.
- Evaluation of Children in Personal Injury Cases, Jermour Maddux, Psy.D., ABPP.
- Evaluating Risk in Child Pornography Offenders, Kostas Katsavdakis, Ph.D., ABPP.
- Evaluations for High Stakes Sentencing: Capital and Juvenile Murder Cases, Mark Cunningham, Ph.D., ABPP.
- MMPI-3 in Personal Injury and Disability Evaluations, Martin Sellbom, Ph.D.
- Child Murder by Parents, Phillip Resnick, M.D.
- Evidence-Based Evaluations of Criminal Responsibility, Terry Kukor, Ph.D., ABPP.

Appendix E
**D. Peters CV**
78

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Evidence for Forensic Mental Health Professionals, David DeMatteo, J.D., Ph.D., ABPP.
- Trauma and Mental Disability Law, Michael Perlin, Esq. & Heather Cucolo, Esq.
- Assessing Allegations of Trauma in Forensic Contexts, Christina Pietz, Ph.D. ABPP.
- Psychological Evaluations in Personal Injury and Civil Rights Cases, William Foote, Ph.D., ABPP.
- The Role of Consultants and Expert Witnesses in Cases of Disputed Confessions, Brian Cutler, Ph.D. & Jeffrey Kaplan, M.Sc.
- Suggestibility in Children: Clinical and Forensic Considerations, Jerrod Brown, Ph.D.
- Allegations of Alienation or Child Sexual Abuse in Custody Evaluations, David Martindale, Ph.D., ABPP.
- Evaluation of Risk for Intimate Partner Violence Using the SARA V3, Stephen Hart, Ph.D.
- American Academy of Forensic Psychology, five-day conference.
- Ethics in Forensic Psychology Practice, Randy Otto, Ph.D., ABPP.
- Report Writing for Forensic Evaluation, Randy Otto, Ph.D., ABPP.
- Confabulation and Suggestibility in Clinical, Forensic, and Judicial Considerations, Jerrod Brown, Ph.D.
- Assessment of Malingering, Barry Rosenfeld, Ph.D., ABPP.
- Structured Interview of Reported Symptoms, second edition training, Richard Rogers, Ph.D., ABPP.
- Psychological Evaluations in Immigration Court, Virginia Barber-Rojas, Ph.D.
- Preparing for Board Certification in Forensic Psychology, Richard DeMier, Ph.D., ABPP.
- Advanced Certification in Trauma, Trauma Center at Justice Resource Institute, Boston, MA, Bessel Van der Kolk, MD, nine-month program.
- Fort Sam Houston Advanced Child Abuse/Domestic Violence Course.
- Fort Sam Houston Child Sexual Abuse Conference.

Appendix E

**D. Peters CV**

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-80

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Pacific Region Forensic Science Workshop, Child Abuse and Interviewing Techniques.
- Developmental Trauma, Bessel Van der Kolk, MD.
- Trauma and Impact on the Brain, Bessel Van der Kolk, MD.
- The Cutting Edge of Mind/Body Medicine.
- Adverse Childhood Experiences Study, Vincent Felitti, MD.
- Neurobiology of Trauma, Bessel Van der Kolk, MD.
- Doctors of the World Training, Conducting Forensic Evaluations in Asylum Cases.
- San Diego Conference on Responding to Child Maltreatment, John Briere, Ph.D. & David Finkelhor, Ph.D.

**Professional Presentations/Invited Guest Lecturer**

- Peters, D. *Self-Care and Ethics in the Immigration Law Practice,* American Immigration Lawyers Association Mid-Winter Conference, Curacao.
- Peters, D. *Working with Refugees and Torture Survivors.* University of Denver, Graduate School of Professional Psychology, International Disaster Program.
- Peters, D. *Assessing and Treating PTSD and Interpersonal Violence,* University of Denver, Graduate School of Professional Psychology, International Disaster Program.
- Peters, D. *Trauma Assessment and Working with Refugees,* University of Denver, Graduate School of Professional Psychology, International Disaster Program.
- Peters, D. *Eye Movement Desensitization and Reprocessing,* University of Denver, Graduate School of Professional Psychology, Doctoral Program in Clinical Psychology.
- Peters, D. *Common Victim Response Following Sexual Assault,* Rape Assistance and Awareness Program, Clinical Staff.
- Peters, D. *Understanding Self-Harm,* Rape Assistance and Awareness Program, Clinical Staff.
- Peters, D. *PTSD and Sexual Assault,* University of Denver, campus-wide Victim Advocate Program.

Appendix E

**D. Peters CV**

80

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Peters, D. *Working with Sexual Assault Victims and Victims of Interpersonal Violence,* Statewide Planned Parenthood Conference, Denver, CO.

- Peters, D. *Assessment and Interventions with Victims of Sexual/Domestic Violence,* medical interns, Swedish Medical Hospital, Denver, CO.

- Peters, D. *Assessment and Interventions with Sexual Assault Survivors and International Refugees,* University of Denver, Graduate School of Professional Psychology.

- Peters, D. *Understanding and Interventions with Prison Rape,* Department of Corrections, State of Colorado (all mental health staff).

- Peters, D. *Interventions in Trauma/PTSD,* University of Memphis.

- Peters, D. *Child Abuse Forensic Interviewing Techniques,* University of Maryland, College Park.

- Peters, D. *Responding to Domestic and Sexual Violence,* US Army Criminal Investigative Services/Military Police, numerous presentations.

- Peters, D. *Responding to Domestic and Sexual Violence Victims,* Air Force Office of Special Investigations, numerous presentations.

- Peters, D. *Victim Dynamics of Sexual Assault and Interpersonal Violence,* Naval Criminal Investigative Services, numerous presentations.

- Peters, D. *Understanding and Preventing Sexual Assault,* US Naval Hospital, Okinawa, Japan, Women's Health Care Symposium.

- Peters, D. *Victimology and Intervention in Sexual Trauma/PTSD,* US Marine Corps/Navy Chaplains Unit, Okinawa, Japan.

- Peters, D. *Understanding and Intervening in Child Abuse,* Department of Defense Schools (DoDS), Okinawa, Japan, multiple presentations.

- Peters, D. *Understanding Child Sexual Abuse/Adult Assault,* Naval Criminal Investigative Service, Okinawa, Japan, multiple presentations.

- Peters, D. *Sexual Assault Prevention,* US Marine Corp-wide stand down, Okinawa, Japan, multiple presentations.

- Peters, D. *Responding to Sexual Assault Survivors/PTSD,* US Naval Hospital, emergency room personnel, Okinawa, Japan, multiple presentations.

Appendix E

**D. Peters CV**

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-82

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## **Published/Broadcast Interviews**

- Peters, D. (2018). Interviewed by Nicole Einbinder. *How Trump's Family Separation Policy Has Affected Parents*. PBS FRONTLINE.

*Updated January 2024*

Appendix E

**D. Peters CV**

82

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-83