# EXHIBIT 3

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

# Evaluation of Holly Shuster

**Hutchinson Black & Cook, LLC**

921 Walnut Street, Suite 200

Boulder, CO 80302

Prepared by:

Donna Peters, Psy.D.

Licensed Clinical Forensic Psychologist

1720 South Bellaire Street, Suite 907

Denver, CO 80222

March 13, 2024

_____

Donna Peters, Psy.D.

Licensed Clinical Forensic Psychologist

License #3153

_____

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-1

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

# Peters' Expert Report

# Contents

I.   SCOPE OF ENGAGEMENT ...................................................................................................... 4

II.   IDENTIFYING INFORMATION AND REFERRAL FOR EVALUATION ............................. 5

CASE SUMMARY ............................................................................................................................ 5

III.   METHOD OF EVALUATION ................................................................................................ 7

PROCESS AND SCOPE OF THE EVALUATION ................................................................................... 7

Documents Reviewed ............................................................................................................ 7

Interviews and Consultations ............................................................................................... 9

Psychological Measures and Testing .................................................................................... 9

PREPARATION OF PARTICIPANTS .................................................................................................. 9

IV.   CURRENT PSYCHOLOGICAL OBSERVATIONS ............................................................. 11

MENTAL STATUS ......................................................................................................................... 11

V.   CLINICAL INFORMATION .................................................................................................. 12

DEVELOPMENTAL AND CLINICAL HISTORY ................................................................................ 12

Family History .................................................................................................................... 12

Education and Work History ............................................................................................... 13

Adverse Events History ....................................................................................................... 14

Age 10 ............................................................................................................................ 14

Age 16 ............................................................................................................................ 14

Age 18 ............................................................................................................................ 15

Age 19 ............................................................................................................................ 15

Legal History ...................................................................................................................... 17

Relationship History ........................................................................................................... 17

Basis for Counterclaim ....................................................................................................... 18

Psychological Abuse ...................................................................................................... 18

Sexual Abuse .................................................................................................................. 20

Physical Abuse ............................................................................................................... 21

Stalking .......................................................................................................................... 21

University of Colorado Boulder Contact ....................................................................... 25

Posttraumatic Functioning ............................................................................................ 26

Current Functioning ...................................................................................................... 28

Records Review ................................................................................................................... 30

Tulane University ........................................................................................................... 30

State of Louisiana .......................................................................................................... 30

Medical History .................................................................................................................. 30

Mental Health History ........................................................................................................ 31

Records Review: Dr. Allison Taylor ............................................................................... 31

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-2

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Records Review: Ms. Gwenn Lowe, LCSW ........................................................................... 31

Phone Interview: Ms. Gwenn Lowe .................................................................................... 32

Records Review: Dr. Lori Evans, Ph.D. .............................................................................. 34

Records Review: Dr. Benito Figueroa ................................................................................. 34

Alcohol and Drug History ....................................................................................................... 35

Collateral Interviews ............................................................................................................... 36

Deb Morel (Ms. Morel) ...................................................................................................... 36

Mike Shuster (Mr. Shuster) ................................................................................................ 37

Genevieve Shuster (Ms. G. Shuster) ................................................................................... 38

PSYCHOLOGICAL TEST DATA ...................................................................................................... 39

Adverse Childhood Experience Questionnaire .................................................................... 39

Beck Depression Inventory-2 .............................................................................................. 40

Beck Anxiety Inventory ....................................................................................................... 40

PTSD Checklist for DSM-5 with Criterion A ..................................................................... 41

Minnesota Multiphasic Personality Inventory-3 ................................................................. 41

Miller Forensic Assessment of Symptoms Test .................................................................. 42

Detailed Assessment of Posttraumatic Stress ..................................................................... 42

Trauma Symptom Inventory-2 ............................................................................................ 43

Personality Assessment Inventory ...................................................................................... 44

SUMMARY OF TESTING ................................................................................................................ 45

VI.   OPINIONS AND ANALYSIS ................................................................................................ 46

OPINION 1 .................................................................................................................................. 46

OPINION 2 .................................................................................................................................. 52

OPINION 3 .................................................................................................................................. 53

Emotional and Behavioral Functioning ............................................................................... 53

Social and Relationship Functioning ................................................................................... 54

Academic Functioning ......................................................................................................... 54

OPINION 4 .................................................................................................................................. 55

Individual Treatment ........................................................................................................... 55

Psychiatric Treatment .......................................................................................................... 57

Group Treatment .................................................................................................................. 58

Pulsed Interventions ............................................................................................................ 58

Academic Accommodations ................................................................................................ 58

SUMMARY AND PROGNOSIS ......................................................................................................... 58

APPENDIX A ............................................................................................................................. 61

DIAGNOSTIC CRITERIA ............................................................................................................... 62

Posttraumatic Stress Disorder (309.81) ............................................................................... 62

Major Depressive Disorder .................................................................................................. 64

APPENDIX B ............................................................................................................................. 65

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-3

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

REFERENCES .................................................................................................................................... 66

**APPENDIX C** ................................................................................................................................. **69**

FEE SCHEDULE ................................................................................................................................. 69

**APPENDIX D** ................................................................................................................................. **70**

RECENT EXPERT TESTIMONY SCHEDULE ........................................................................................ 70

United States Military Courts Martial ........................................................................................ 70

Depositions ................................................................................................................................. 70

Criminal Courts .......................................................................................................................... 711

**APPENDIX E** ................................................................................................................................. **71**

CURRICULUM VITAE ....................................................................................................................... 72

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-4

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

| | | | |
|---|---|---|---|
| **Name** | Holly Shuster | **Referral date** | 09/15/2023 |
| **DOB** | 11/27/2002 | **Interview date** | 01/10 & 01/11/2024 |
| **Examiner** | Donna Peters, Psy.D. | **Report date** | 03/13/2024 |

# I.     Scope of Engagement

This document is my expert report in the matter of Jacob Levy v. Holly Shuster. I was retained in this matter by Attorneys Kimberly Hult and Dan Williams of Hutchinson, Black and Cook, LLC, on 09/15/2023, to conduct a forensic psychological evaluation of Holly Shuster. I have been asked to provide an expert opinion on the possible psychological effects and future impact of emotional, physical, and sexual abuse of the defendant and counterclaim plaintiff, Holly Shuster, by Jacob Levy that occurred during the relationship while both were students at Tulane University, and involved in a relationship. I was further asked to provide an opinion on the psychological impact of the stalking of Ms. Shuster by Mr. Levy after Ms. Shuster ended the relationship. I completed a conflict-of-interest check, and no conflicts were found.

4

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-5

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## II.   Identifying   Information   and   Referral   for Evaluation

Ms. Shuster is a 21-year-old woman who was referred by counsel in this case to determine the existence and impact of possible psychological issues stemming from alleged emotional, physical, and sexual assaults by Mr. Levy. I am further asked to opine on the possible psychological impact of the stalking of Ms. Shuster by Mr. Levy following the end of the relationship.

## Case Summary

In August 2023, Mr. Levy filed a complaint alleging that he was emotionally, reputationally, and financially injured by false allegations of sexual assault and college expulsion levied at him by his former girlfriend, Ms. Shuster. In his complaint, Mr. Levy maintained that he and Ms. Shuster were involved in a relationship from November 2020 to October 2021 and lived together in an apartment for a period of time. Mr. Levy detailed in his complaint that he and Ms. Shuster had a consensual sexual relationship until October 2021, when the relationship ended. Mr. Levy stated that he agreed to leave the school as part of a mutual No Contact Order issued by Tulane University. Mr. Levy purported that after leaving Tulane University, he eventually enrolled at Front Range Community College with plans to transfer to the University of Colorado Boulder. He reported that he pledged to a fraternity at the University of Colorado Boulder in August 2022, and his pledge was accepted by the fraternity. Mr. Levy contended that in September 2022, Ms. Shuster caused some text messages to be sent to the fraternity social chairs alleging that Mr. Levy had emotionally, physically, and sexually assaulted Ms. Shuster during their relationship. Mr. Levy submitted that he was terminated from the fraternity secondary to the text messages and was forced to leave school after others around the school "bullied" and "ostracized" him (First Amended Complaint and Jury Demand).

Mr. Levy claims the following (First Amended Complaint and Jury Demand):

1. First Cause of Action: Defamation *per se* and *per quod*

2. Second Cause of Action: Intrusion on seclusion

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-6

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

   3.   Third Cause of Action: Unreasonable disclosure of private facts

Ms. Shuster filed several counterclaims detailing that Mr. Levy emotionally, sexually, and physically abused her on multiple occasions over the course of the relationship. Ms. Shuster indicated that after the ending of the relationship in late October or early November 2021, Mr. Levy stalked her through repeated text messages and phone calls, accessed her social media accounts, and broke into her dormitory room. She reported the stalking behavior to Tulane University officials and received a mutual No Contact Order. Ms. Shuster contended that Mr. Levy continued to stalk her, and she sought a Petition for Protection from a Louisiana state court. Ms. Shuster submitted that she was initially issued an Order of Protection and Temporary Restraining Order. The Court issued Consent Orders and a Permanent Injunction in February 2022.

Ms. Shuster asserted the following counterclaims (Answer to First Amended Complaint and Amended Counterclaims):

   1.   First Claim for Relief: Sexual Assault—Sexual Battery

   2.   Second Claim for Relief: Sexual Assault—Third-Degree Rape

   3.   Third Claim for Relief: Battery

   4.   Fourth Claim for Relief: Assault

   5.   Fifth Claim for Relief: Civil Stalking

   6.   Sixth Claim for Relief: Civil Cyberstalking

   7.   Seventh Claim for Relief: Violation of The Stored Communications Act, 18 U.S.C. § 2701, Et. Seq.

   8.   Eighth Claim for Relief: Intentional Infliction of Emotional Distress

   9.   Ninth Claim for Relief: Violation of Louisiana Civil Code Article 2315

6

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-7

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## III.  Method of Evaluation

### Process and Scope of the Evaluation

In forming my opinions in this case, I conducted a full psychological evaluation of Ms. Shuster. I analyzed all information provided to me regarding Ms. Shuster, including but not limited to (1) identifying information, (2) psychosocial history (education, living situation, occupational history, religious affiliation, medical and mental health history, etc.), (3) details of the alleged intimate partner violence, subsequent stalking and the perceived emotional impact, (4) collateral interview with Gwenn Lowe (treating therapist), (5) collateral interview with Deb Morel (mother), (6) collateral interview with Michael Shuster (father), (7) collateral interview with Geneieve Shuster (sister), and (8) administration of psychological evaluations pertinent to the assessment questions. I also considered alternative explanations for Ms. Shuster's past and present psychological struggles in formulating my opinions.

### Documents Reviewed

- First Amended Complaint and Jury Demand
- Answers to First Amended Complaint and Amended Counterclaims
- Minute Order
- Non-Disclosure Agreement
- Dr. Benito Figueroa: Mental health records
- Dr. Allison Taylor: Mental health records
- Dr. Lori Evans: Therapy records
- Gwenn Lowe: Medical records
- Gwenn Lowe: Psychotherapy notes
- Holly Shuster 0000001-0000002
- Holly Shuster 0000004-0000012
- Holly Shuster 0000013-0000021
- Holly Shuster 0000022-0000022
- Holly Shuster 0000075
- Holly Shuster 0000112-0000113

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-8

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Holly Shuster 0000115
- Holly Shuster 0000382-0000388
- Holly Shuster 0001963-0001975
- Holly Shuster 0002122-2000123
- Holly Shuster 0002205
- Holly Shuster 0002481-0002482
- Holly Shuster 0002525
- Holly Shuster 0003302
- Holly Shuster 0003315
- Holly Shuster 0003317-0003318
- Holly Shuster 0003320-0003321
- Holly Shuster 0003325
- Holly Shuster 00409909
- Holly Shuster 00388670
- Holly Shuster 00332044
- Holly Shuster 00344155
- Holly Shuster 00345841
- Holly Shuster 00403898
- Holly Shuster 00350398
- Holly Shuster 00481545
- Holly Shuster 00481544
- Holly Shuster 00393842
- Holly Shuster 00388672
- Jacob Levy 0000522-0000527
- Jacob Levy 0000533-0000547
- Jacob Levy 0000561-0000565
- Tulane 0000045-0000049
- Tulane 0000229

8

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-9

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Interviews and Consultations

- Clinical interview/testing with Holly Shuster (7.0 hours)   01/10/2024
- Clinical interview/testing with Holly Shuster (7.0 hours)   01/11/2024
- In-person interview with Deb Morel (1.0 hour)   01/10/2024
- Phone interview with Michael Shuster   02/03/2024
- Phone interview with Genna Shuster   02/03/2024
- Phone consult with Gwenn Lowe   02/09/2024

## Psychological Measures and Testing (Given in the order listed on 01/10/2024 and 01/11/2024)

- Adverse Childhood Experience (ACE) Questionnaire
- Life Events Checklist for DSM-5
- Domestic Violence Checklist
- Beck Depression Inventory-2 (BDI-2)
- Beck Anxiety Inventory (BAI)
- PTSD Checklist (PCL-5) with Criterion A
- Minnesota Multiphasic Personality Inventory-3 (MMPI-3)
- Miller Forensic Assessment of Symptoms Test (M-FAST)
- Detailed Assessment of Posttraumatic Stress (DAPS)
- Trauma Symptom Inventory-2 (TSI-2)
- Personality Assessment Inventory (PAI)

## Preparation of Participants

For all participants contacted concerning this evaluation, I identified myself, my professional role in the case, the purpose of the evaluation, and the non-confidential nature of the information obtained. I informed Ms. Shuster that I was retained by her attorneys and would be performing an assessment to determine the possible psychological impact of various forms of intimate partner violence and stalking. I explained that the results of my interview with her, the review of documentary evidence, and the results of the tests could be used in a written report that would be shared with opposing attorneys and others involved in her civil case. Ms. Shuster signed consent outlining these issues. Ms. Shuster

9

EXHIBIT 2-10

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

agreed to discontinue the testing if, at any time, she felt she was not able to put forth her best effort in the test. Ms. Shuster verbalized her understanding of the consent form as follows: "Everything I say will be laid bare. I am happy to have another opportunity to get my story out there. It [my story] can go to my lawyers and other lawyers. This is not a therapeutic process. You have to report suicidal information and homicidal threats."

ATTORNEYS' EYES ONLY-                                    EXHIBIT 2-11
HIGHLY CONFIDENTIAL

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## IV.  Current Psychological Observations

### Mental Status

Ms. Shuster arrived on time for both evaluation sessions, accompanied by her mother, who remained outside the interview room. Ms. Shuster was dressed age appropriately for the occasion and was well-groomed, with clean hair and nails. She was polite, attentive, and cooperative during the evaluation. Her answers to the questions were largely relevant and detailed, and she was able to follow directions. Her speech was goal-directed, and her tone and rate of speech were spontaneous and easy to understand.

Ms. Shuster's affect was broad, and her mood was generally euthymic (normal/calm). She was not grandiose (especially grand) in her thinking and did not reveal any delusional thinking. She did not endorse any perceptual disturbances, including auditory and visual hallucinations, and she never appeared preoccupied with internal stimuli. Ms. Shuster denied any suicide attempts or current suicidal ideation, plan, or intent for harming self, either currently or historically.

Concerning cognitive functioning, Ms. Shuster was oriented to time, place, and circumstance. Her remote memory was intact, and she could relate her history in a generally logical and sequential manner. Her concentration and attention appeared adequate. Ms. Shuster's general level of intelligence and fund of knowledge appeared to be within normal limits for her age and level of education. She did not appear to have any reading or reading comprehension problems and did not report or display any frustration with the testing.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-12

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# V.   Clinical Information

## Developmental and Clinical History

### Family History

The following family and academic histories are based primarily on Ms. Shuster's responses during the clinical interview portion of the evaluation. The early developmental history was provided by Ms. Deb Morel, Ms. Shuster's mother.



ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL                                    EXHIBIT 2-13

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster



## Education and Work History

Ms. Shuster attended public school in the same school district throughout high school. She described herself as a good student who was studious and enjoyed learning. She was in several honors classes in high school. Ms. Shuster did not experience any learning difficulties and had no remedial services. She was never expelled, suspended, or retained a grade. She had a friend group and maintained good peer relations. She did not experience any bullying by others.



Ms. Shuster graduated from Scarsdale High School in 2020 and entered college at the age of 17. She graduated from high school with a GPA of 3.48. She had a choice of schools and decided to attend Tulane University after a campus visit. Ms. Shuster did not complete a degree at Tulane. She took the fall semester of 2022 off after receiving an academic dismissal for low grades and missed classes (see Posttraumatic Functioning). Ms. Shuster applied for and was granted readmission to Tulane in December 2022 and returned to

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-14

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Tulane for the spring semester of 2023 (Bates 00481245). Ms. Shuster left Tulane permanently following the completion of the spring semester of 2023. She is not currently enrolled in school (see Posttraumatic Functioning).

Academic records from Tulane University are illustrative of Ms. Shuster's academic history and performance from fall 2020 to spring 2023 (Bates 0000075).

> Fall 2020: GPA 0.429
>
> Spring 2021: GPA 1.959
>
> Fall 2021: GPA 0.570
>
> Spring 2022: GPA 0.000
>
> Fall 2022: Academic dismissal for quality of work
>
> Spring 2023: GPA 0.375

Ms. Shuster is not currently employed. She has had one job, working part-time as a salesperson in a boutique for two months during the summer of 2021. She completed an unpaid internship for college credit during the fall of 2022, interning at a public relations firm. She completed a second internship during the summer of 2023, working from home.

## Adverse Events History

### Age 10

Ms. Shuster explained that she experienced Hurricane Sandy in 2012. She reported that school was closed for several weeks due to the storm. She stated that no one she knew was injured, and her home was not damaged. Ms. Shuster described this event as "scary."

### Age 16

Ms. Shuster remarked that she was involved in a motor vehicle accident with her then-boyfriend. She added that another vehicle hit them, and they veered off the road, hitting a light pole. She related that the other vehicle flipped over. Ms. Shuster recounted that no one involved in the accident was seriously injured. She noted that she had a minor laceration to her leg from the deployment of the airbag. Ms. Shuster recalled that she did not require medical attention.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-15

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Ms. Shuster submitted that following the motor vehicle accident, she had several nightmares of "bad things" happening to her. She conveyed that the nightmares were of short duration and completed dissipated after a brief period.

**Age 18**



**Age 19**

Ms. Shuster explained that she was a passenger on a plane that was struck by lightning during a storm. She added that there was no damage to the plane, and it landed safely. She related that she had been a nervous flyer prior to this incident and, thereafter, became more nervous with air turbulence.

**Age 20**



15

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-16

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster



ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-17

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Legal History

Ms. Shuster has never been arrested and has no history of criminal behavior. She is her own legal guardian.

## Relationship History

Ms. Shuster recounted that she dated in high school and had a one-year relationship that ended during COVID-19. She noted that the relationship ended because it was difficult to maintain during the pandemic and subsequent shutdown. Ms. Shuster recalled that the relationship was not serious and ended on amicable terms. She submitted that she had never experienced any form of aggression or intimate partner violence in that relationship.

Ms. Shuster shared that she met Jacob Levy at Tulane University in August 2020. She indicated that she was introduced to Mr. Levy by her roommate at the time. She maintained that when she met Mr. Levy, she was interested in another student, Mr. Grove, and did not see Mr. Levy again until she contracted COVID-19 and was quarantined at a nearby hotel, as was Tulane's policy. Ms. Shuster contended that while quarantined, several Tulane students who were all quarantined at the hotel started a group chat, and Mr. Levy was one of those students. She described that Mr. Levy reached out to her through this group chat and invited her to his room, where other students were also expected to meet. Ms. Shuster reported that when she arrived at Mr. Levy's room, no other students were present, and no one else showed up.

Ms. Shuster stated that she and Mr. Levy drank wine and, during the course of the evening, had consensual sex. Ms. Shuster continued that she returned to her hotel room to sleep that night. She detailed that Mr. Levy texted her multiple times following that night, and she ignored his text messages. She explained that she would see Mr. Levy at social gatherings, as she and Mr. Levy shared mutual friends. Ms. Shuster remarked that Mr. Levy wanted to have a dating relationship with her, . She added that she felt Mr. Levy had a "crush" on her. ██████ ███████████████████████████████████████████████████████████ ██████████████). She recounted that Mr. Levy tried to convince her to date him instead, asserting that he would treat her well.

17

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-18

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Basis for Counterclaim

The following information is organized into types or categories of intimate partner violence for ease of understanding and is not a timeline of events. Due to the number of incidents reported, the following is not an exhaustive description of all incidents but is rather a summary of the most salient events as determined by Ms. Shuster.

### Psychological Abuse

Ms. Shuster noted that over the course of her relationship with Mr. Levy, he repeatedly emotionally abused her. She recalled that the first occasion of emotional abuse occurred in October 2020 when Mr. Levy found out she was dating Mr. Grove and called her a "whore." Ms. Shuster submitted that Mr. Levy acted as though she had hurt him even though they were not involved in a relationship at the time. She expressed that Mr. Levy told her that people were gossiping about her. She shared that in that moment, she felt bad about herself. She disclosed that Mr. Levy told her he cared about her and did not listen to gossip. Ms. Shuster indicated that she and Mr. Levy began dating at that time.

Ms. Shuster maintained that during the relationship with Mr. Levy, she lost all sense of herself. She described that she had stopped trusting herself. She reported that she felt as though she was constantly disappointing Mr. Levy. She reported that Mr. Levy called her disparaging names, including "whore," "slut," and "stupid." Ms. Shuster stated that Mr. Levy would tell her, "You are such a child," and, "You make stupid decisions." She continued that at that time, she began to experience significant anxiety. She explained that she had anxiety in high school prior to the relationship and ranked this anxiety as 5 on a 10-point scale, where 10 is the most severe. She added that at the time of her relationship with Mr. Levy, her anxiety increased to an 8 or 9, with 10 being the most severe.

Ms. Shuster related that Mr. Levy went through her cell phone and looked at her messages. She recounted that Mr. Levy would access her social media accounts while she was sleeping. She recalled that upon awakening, she would notice she was logged out of her social media accounts when she had not logged out before falling asleep.

A review of text messages between Ms. Shuster and Mr. Levy on 12/17/2020 indicated that Mr. Levy asked for Ms. Shuster's Snapchat password. Ms. Shuster initially refused to

18

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

give Mr. Levy the password but eventually gave it to him after multiple back-and-forth texts (Bates 0001963-0001975).

Ms. Shuster submitted that Mr. Levy threatened suicide on several occasions during the relationship, with the first threat in October 2021. She shared that on these occasions, Mr. Levy would tell her that the only reason he did not kill himself was because of her. She disclosed that she feared Mr. Levy would hurt himself if she left. She indicated that it seemed that Mr. Levy had "no motivations outside of her."

Ms. Shuster detailed that Mr. Levy controlled her time with friends. She maintained that Mr. Levy would tell her that her friends were gossiping about her, and she began spending less time with friends and more time with Mr. Levy. She contended that it was easier to just be with Mr. Levy, as he was always concerned that she was saying negative things about him to her friends. Ms. Shuster described that Mr. Levy moved into her dorm room with her, and she started to miss classes and assignments to be with him. She reported that at that point, the relationship was not healthy, and her anxiety was increasing due to Mr. Levy's increasingly controlling behavior. She also stated that COVID-19 and remote learning were factors in her declining grades at that time. Ms. Shuster explained, "Everything was about pleasing him." She continued that she stopped communicating with her family as often as before because she feared they would notice something was wrong. She admitted that she loved Mr. Levy and did not want to lose him at that point in the relationship.

Ms. Shuster purported that Mr. Levy told her how to dress and would become upset if she wore anything "revealing." She remarked that Mr. Levy would tell her, "That is not how girls with boyfriends dress." She added that Mr. Levy became upset if she talked with other guys at a social gathering and would call her a "slut." Ms. Shuster related that she would feel guilty after Mr. Levy became upset, and she began to avoid situations or social gatherings where other males would be present.

Ms. Shuster recounted that Mr. Levy would become so angry with her at times that she feared him. She noted that Mr. Levy would scream, yell, and berate her. She recalled that Mr. Levy would then have periods of being loving and kind and would apologize for his

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-20

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

behavior. Ms. Shuster admitted that she believed Mr. Levy and hoped the loving behavior would continue.

Ms. Levy submitted that she and Mr. Levy went to their separate homes during the summer break of 2022. She shared that Mr. Levy called her daily and would become upset if she did not immediately answer his calls or texts, texting multiple times in a row until she answered. She indicated that Mr. Levy would ask for her work schedule so he knew where she was. Ms. Shuster maintained that she allowed Mr. Levy to track her phone through Life 360, and he would call or text her asking her why she was at a particular location at any time. She contended that it felt as though Mr. Levy was her "parent" and that he had all the power in the relationship.

**Sexual Abuse**

Ms. Shuster described that Mr. Levy repeatedly engaged in coercive sexual assault during the relationship. She reported that Mr. Levy pressured her to comply with his desire for sex and would ask for sex repeatedly until she gave in. Ms. Shuster stated that there were many verbal arguments around sex in the relationship. She continued that if she said "No," Mr. Levy would berate her, telling her that something was wrong with her sexually or accusing her of not loving him and being interested in someone else. She explained that this pressure and coercion occurred daily during the relationship. Ms. Shuster remarked that, at times, she cried and stared at the ceiling during sex, as it was painful. She added that if she refused to have sex, Mr. Levy would masturbate and ejaculate on her. She related that she would feel relieved when Mr. Levy ejaculated, as that meant he would leave her alone. She recounted that there were many times she would give up and just agree to sex, as it was easier.

Ms. Shuster noted that Mr. Levy was aggressive during sex and wanted her to act like she enjoyed it. She recalled that he would hit her with an open hand in the face, chest, and thigh area. She submitted that Mr. Levy "choked" her by applying pressure to the front of her throat with his hand. She shared that this had happened on more than one occasion, and she would ask him not to squeeze her neck. She disclosed that there were times when she could not breathe, but she experienced no loss of consciousness. Ms. Shuster indicated that if she told Mr. Levy to stop squeezing her neck, he would only stop after she really

20

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

struggled. She maintained that she would panic, thinking Mr. Levy would not stop. She contended that Mr. Levy would tell her it was okay and that "this is what adult relationships are like." Ms. Shuster described that she tried to avoid having sex with Mr. Levy to avoid the choking incidents.

Ms. Shuster reported that there were times when she would wake up and Mr. Levy was digitally penetrating her or masturbating on her. She stated that at those times, she had been asleep and had not given Mr. Shuster permission to have sex or engage in sexual activities with her while she was sleeping. She continued that Mr. Levy took videos of her on his phone during sex. She explained that sometimes she knew he was recording, and sometimes she did not. Ms. Shuster remarked that after sex, Mr. Levy would show her the videos. She added that, to her knowledge, Mr. Levy did not post the videos anywhere but would talk about sharing them with his friends. She related that Mr. Levy told her she was "lucky" to have a boyfriend who would never show the videos to anyone.

Ms. Shuster recounted that over the summer of 2022, while home with her family, she sexted/texted Mr. Levy about having rough sex and the things she wanted him to do to her sexually. She noted that she texted these comments because she wanted to please Mr. Levy, knowing he enjoyed this type of conversation. Ms. Shuster conveyed that she wanted to make Mr. Levy happy. She recalled that it was easier to say these things in text messages when she was home with her family in New York, as she knew she would not have to follow up or do anything sexual with Mr. Levy.

**Physical Abuse**

In addition to the hitting and choking during sexual interactions, Ms. Shuster submitted that Mr. Levy pushed her on several occasions during an argument. She expressed that Mr. Levy would push her with both his hands against her chest or by sweeping his arm out and against her body.

**Stalking**

Ms. Shuster shared that she broke up with Mr. Levy three times over four days in early November 2021. She disclosed that at that time, she and Mr. Levy were no longer living together, and she was able to get some separation from the relationship. She indicated that she started wondering if she was the problem in the relationship or if it was Mr. Levy. She

21

EXHIBIT 2-22

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

maintained that she still loved Mr. Levy at that time but no longer wanted to be with him, given his treatment of her. Ms. Shuster contended that she moved into a dormitory building that had key access only, and this made her feel safe enough to end the relationship.

Ms. Shuster described that she told Mr. Levy she wanted a break from the relationship but that maybe they could be together again in the future. She detailed that Mr. Levy became upset and accused her of wanting to be with other men. She reported that she apologized to Mr. Levy due to his intense anger. Ms. Shuster stated that at that time, Mr. Levy turned around and said, "No, I am ending the relationship." She continued that Mr. Levy called her multiple times, asking if they could get back together. Ms. Shuster acknowledged that at that time, she decided she wanted the relationship to be over.

Ms. Shuster explained that Mr. Levy showed up at her dormitory repeatedly following the breakup. She recounted that Mr. Levy showed up outside of her dormitory between 10 and 20 times. She noted that he would sometimes stand outside and yell her name when she came out of the dormitory. Ms. Shuster recalled that Mr. Levy would appear outside her dormitory at night and watch her when she came outside to be picked up by one of her friends. She submitted that she never said anything to Mr. Levy during these times. She shared that she started to panic because of how many times Mr. Levy showed up at her dormitory. She disclosed that, at that time, Mr. Levy could not have known her schedule. She indicated that she suspected he was waiting and watching outside.

Ms. Shuster maintained that she would sometimes see Mr. Levy when she was out in public. She contended that on one occasion, she was at a popular bar with friends, and Mr. Levy was there and attempted to touch and grab her arm. She described that she panicked and moved away from him. She reported that this happened approximately twice after the No Contact Order was put into place.

Ms. Shuster stated that Mr. Levy continued to text her multiple times a day. She continued that the text and phone messages from Mr. Levy were initially friendly but quickly progressed to anger and desperation. Ms. Shuster explained that she was frightened by his words, "We are meant to be together" and "You are going to regret this someday." She remarked that she felt Mr. Levy was "off the rails" and that he could potentially do

22

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-23

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

something to her or himself. She added that she initially tried to answer him, as she still loved him and felt compassion for him, questioning whether she should be helping him.

A review of the text messages between 11/05/2021 and 11/16/2021 evidenced multiple messages sent by Mr. Levy to Ms. Shuster. On 11/09/2021, Mr. Levy sent approximately 147 text messages to Ms. Shuster. The text messages appeared to be increasingly desperate in tone over time. The texts indicated that Mr. Levy was vacillating between desperation and anger. In one text, Mr. Levy wrote, "You have stood me up and blown me off and ignored me for the last time." Later in the text chain, Mr. Levy stated, "I am on hold with the crisis line." "I just want to talk." "I am not doing well." (Bates 0002282).

One of the most upsetting incidents occurred on or around November 3, 2021. Ms. Shuster noted that Mr. Levy came to her dormitory room while she was out. She recalled that she and her roommate never locked their dormitory room door, as the building was secure and a keycard was needed to gain entry. She submitted that she returned to her dormitory room to find Mr. Levy lying on her bed, appearing as though he had been crying. She shared that her room was in disarray, and things had been moved. Her roommate, Liberty, was very upset and scared.

Ms. Shuster disclosed that she asked Mr. Levy to go with her to the common room so that she could get him out of the room. She mentioned that Mr. Levy appeared intoxicated, as he was slurring his words. She indicated that Mr. Levy was screaming and yelling at her, asking her where she had been and who she had been with. She maintained that at that time, Mr. Levy had pulled off a heavy ring he was wearing and threw it at her face. She contended that she ducked out of the way, but she became very frightened at that time. She described that she and Mr. Levy moved to the outside balcony area, as other students could hear him screaming at her, and she wanted to calm him down. Ms. Shuster reported that once outside, Mr. Levy grabbed her by both shoulders and pushed her against the balcony railing, with her back hitting the railing. She stated that Mr. Levy asked her, "Do you think I will push you?" Ms. Shuster continued that she feared Mr. Levy would push her and she would fall four floors to the ground. She explained that Mr. Levy released her, and she started crying. She remarked that she ran back to her dormitory room and locked the door. She added that when she returned to her room, she found a letter on her bed from Mr. Levy.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-24

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

On another night, Ms. Shuster related that Mr. Levy showed up at her dormitory room and pounded on the door when Ms. Shuster was not there, terrifying her roommate. She shared that Mr. Levy would stand outside her dorm building, and she never knew when he would be there. She disclosed that she became afraid of leaving her dormitory alone. She indicated that Mr. Levy sent her a message on December 21, 2021, asking her to meet him at the top of a parking structure near her dormitory. She maintained that the message was threatening in nature, demanding that she meet him at the parking structure "or else." She contended that she feared for her safety and experienced sleep problems and nightmares.

Ms. Shuster purported that she was on academic probation and was assigned a case manager, Deanna Robertson. She described that she disclosed Mr. Levy's stalking behavior to a case manager, who assisted her in obtaining a No Contact Order. Ms. Shuster reported that even after the No Contact Order, Mr. Levy continued to direct message her on Instagram and leave voice messages that were sometimes sad and sometimes threatening. Ms. Shuster explained that she called campus police to report a violation of the No Contact Order and eventually got an Order of Protection from the state of Louisiana after speaking with her attorney.

Ms. Shuster remarked that she did not include the accusations of sexual assault when she asked for the No Contact Order and Order of Protection. She added that she did not want to disclose any details of the sexual abuse and only reported the stalking behavior by Mr. Levy. She related that at that time, she doubted herself and still had compassion for Mr. Levy. She said, "This was a big deal, and it was my fault for not reporting it at this time." Ms. Shuster recounted that she did not believe that her sexual assaults fit the definition of rape. She noted that she did not feel as though she deserved to use the term rape or sexual assault. Ms. Shuster recalled that her definition of rape was being physically restrained or incapacitated. She submitted that she questioned whether the assaults were her fault and if there was something wrong with her. Ms. Shuster expressed that at the time, she thought Mr. Levy had a right to have sex with her, as the two of them were in a relationship. She shared that Mr. Levy sexually assaulted her multiple times, and she let him. Ms. Shuster disclosed that reporting the sexual assault at this time was too much, and she could not talk about it. She indicated that it took her a while to realize that Mr. Levy's behaviors were, in fact, sexual assault.

24

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-25

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Ms. Shuster believed that Mr. Levy continued to violate the No Contact Order and the Order of Protection on several occasions by either contacting her directly or through his or her friends. She contended that she sometimes received calls from a number with no caller identification and believed it was Mr. Levy.

A review of email correspondence between Mr. Levy and Brad Browning (relationship, breakup and divorce coach), dated 12/16/2021, indicated that Mr. Levy contacted Ms. Shuster. Mr. Levy wrote in an email, "So today, I caved and reached out to Holly" (JL 0522).

**University of Colorado Boulder Contact**

Ms. Shuster described that approximately six months after Mr. Levy left Tulane University, she discovered he was attending a school in Colorado. She reported that she was angry and felt that Mr. Levy was a danger. Ms. Shuster stated that her friend had sent her a TikTok video of Mr. Levy at a fraternity get-together. She continued that it worried her that Mr. Levy might sexually assault another girl. She explained that she felt Mr. Levy being in a fraternity presented a higher risk for assaulting someone else, as her impression of fraternities includes a lot of parties with young females. Ms. Shuster remarked that, to her, being in a fraternity meant that Mr. Levy had more power over potentially vulnerable females.

Ms. Shuster related that her friend, Claire Arnold, suggested that she contact the fraternity in Colorado. Months earlier, Ms. Shuster recounted that she had prepared an outline/letter for herself to have a timeline of events with Mr. Levy. She noted that this letter was given to Ms. Arnold, who then contacted the president of the fraternity at the University of Colorado Boulder. Ms. Shuster recalled that her identity was not included in the letter. She submitted that the fraternity asked Ms. Arnold for a copy of the Order of Protection order, and Ms. Shuster supplied it to Ms. Arnold. Ms. Shuster expressed that she redacted names from the letter, as she was still very afraid of Mr. Levy, but she thought it was important that he not be allowed to join a fraternity. She shared that she thought what she did was a good thing, and she felt an obligation to protect others. She disclosed that at that time, she did not think she was doing anything wrong.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-26

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Ms. Shuster indicated that after Mr. Levy was asked to leave the fraternity, he filed a civil case against her, demanding a full retraction of her allegations of sexual assault. She said that she could not say it did not happen and it was not untrue. She stated, "This is my story, and I have a right to be honest."

Of the relationship, Ms. Shuster contended that she stayed in the relationship with Mr. Levy as long as she did because she cared about him. She described that Mr. Levy was alternately kind and abusive and would turn from being mean to being her comforter. She reported that she believed no one understood him as she did. She stated that she justified his behavior.

Ms. Shuster continued that she did not tell her parents about the abuse during the relationship, as she feared they would tell her to get out of the relationship, and she did not want to end the relationship at that time. She explained that she did not want to face the fact that she was in an abusive relationship.

**Posttraumatic Functioning**

Posttraumatic distress is an individual's response to the index trauma in the days, weeks, months, or years following the trauma. It includes the functional impact or impairment experienced in multiple areas of an individual's life, including emotional and behavioral, social and relational, academic, and leisure.

Ms. Shuster related that she stopped attending class after breaking up with Mr. Levy and obtaining the No Contact Order. She recounted that she feared leaving her dormitory and had lost interest in school. Ms. Shuster noted that after Mr. Levy left school in the spring semester of 2022, she had a very difficult time. She recalled that everything seemed to hit her at that time. She submitted that she was nervous that Mr. Levy would come back to campus, and she did not feel safe. She shared that she would jump at any noise, was constantly on edge, and had trouble sleeping. She disclosed that she had a loss of appetite, with weight loss of between 10 and 15 pounds over a period of several months.

Ms. Shuster indicated that she felt very responsible for everything that had happened, as she believed she had let it happen. She maintained that she could have left the relationship sooner. She contended that she had low self-esteem and dislike for herself at that time, and she wondered if she would ever be happy again. Ms. Shuster endorsed nervousness, fear,

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-27

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

sadness, and a total loss of interest in everything. She described that she wanted "to be someone else."

Ms. Shuster reported that she was physically anxious following the breakup with Mr. Levy and was constantly watchful and looking over her shoulder. She stated that she would look around when she was out in public. She continued that she would have periods of intense anxiety that included a racing heart, shaking, weakness in the knees, and concentration difficulties. Ms. Shuster explained that if she was not anxious, she felt numb. She remarked that she neglected her appearance and personal hygiene and felt helpless and hopeless regarding the future. She added that she was just going through the motions and had thoughts that nothing would ever get better. She related that life did not feel real to her.

Ms. Shuster recounted that she experienced sleep disturbances with difficulty initiating sleep for several days in a row and then feeling exhausted and sleeping for 12 hours. She noted decreased appetite with weight loss and avoidance of socializing and going out with friends. Ms. Shuster recalled that she increased her level of alcohol consumption and was drinking three to four mixed drinks several times per week. She submitted that previously, she had consumed one mixed drink or one to two glasses of wine once per week. She added that at that time, she was drinking to intoxication.

Ms. Shuster shared that she took a semester off in the fall of 2022 after being dismissed for poor academic performance. She attempted to return to school for the spring semester of 2023. She disclosed that she was struggling emotionally, and her grades were poor. She indicated that she withdrew from some classes and missed a lot of class time. She conveyed that she did not care about school or grades. Ms. Shuster maintained that the legal issues were still weighing on her, and she was required to relate the incidents of abuse by Mr. Levy multiple times, prompting worsening struggles.

Ms. Shuster contended that she eventually started dating after the breakup with Mr. Levy but experienced difficulties with intimacy in the relationship. She described having difficulty detangling or separating Mr. Levy from her dating partner. She reported that when she was eventually able to engage in sexual intimacy, it felt different, as her partner did not pressure or push her when she said no. Ms. Shuster stated that she never felt like saying "No" was an option with Mr. Levy.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-28

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Current Functioning

Ms. Shuster explained that she continues to feel anxiety, though at lower levels than previously. She continued that she is hypervigilant of her surroundings and pays attention to who is around her. She remarked that she does not like being alone at home and has a constant fear of somebody breaking in. She added that she often feels fear and is on edge in public spaces. She related that she is particularly uncomfortable with men looking at her. Ms. Shuster recounted that memories of the abuse pop into her head. She noted that she has memories of Mr. Levy yelling at her and coercing her into having sex. She recalled that she has nightmares approximately three to four times per week in which she is being chased or someone has broken into her home. She submitted that she has nightmares of Mr. Levy trying to talk to her and she cannot get away from him. Ms. Shuster shared that she wakes up sweating, and it can take her one to two hours before she is able to return to sleep.

Ms. Shuster disclosed that she feels upset with reminders of Mr. Levy or exposure to hearing about domestic violence or sexual assault in the news or on television. She indicated that she is triggered by songs that she and Mr. Levy used to listen to, and she is unable to look at pictures from that time, even of herself. Ms. Shuster maintained that when she experiences any reminder of the past and Mr. Levy, she feels sick to her stomach and anxious. She contended that it feels like she was exposed to "something horrible."

Ms. Shuster described avoidance behaviors that include trying to distract herself and keep her mind busy to avoid thoughts of past abuse. She reported that she listens to a podcast, listens to music, or reads to distract herself. She stated that thoughts from the past creep in if she is not doing something. Ms. Shuster further described avoidance of places that are reminders of Mr. Levy, including her house on Long Island, where Mr. Levy stayed in their guestroom. She reported having never been back in that room since the breakup with Mr. Levy. Ms. Shuster explained that she has friends at Tulane University, and when she visits them, she avoids going on campus, as it holds bad memories for her.

As detailed by Ms. Shuster, she has negative feelings about herself and experiences a lot of self-doubt and difficulty deciding what is right for her. She remarked that she has moments of not feeling good about anything. She added that she does not trust people and

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-29

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

assumes the worst of others. She related that she fears someone may hurt her if she allows it. Ms. Shuster recounted that she blames Mr. Levy for what happened and how he treated her, but she also blames herself. She noted that she could have told someone what was happening, and she could have left the relationship.

Ms. Shuster recalled that she continues to experience anxiety, with many physiological manifestations that she described as "panic attacks." She submitted she feels like she loses her senses, has difficulty breathing, has tunnel vision, and experiences a roaring in her ears. She estimated that the panic attacks started in the spring or summer of 2022. She shared that she had these intense periods of anxiety approximately three times per month and currently notices them about one time per month.

Ms. Shuster disclosed ongoing sadness, hopelessness, and low self-esteem. She indicated that she feels pessimistic about the future, and it is difficult to think about the future. She maintained that she is hesitant to meet new people or allow people into her life. She contended that she feels distant from others and worries that others may have ill intent. She described that all her current relationships were pre-existing to the relationship with Mr. Levy. Ms. Shuster reported that she feels she becomes submissive around males, and she loses her power.

Ms. Shuster stated that it is difficult to be happy for more than brief periods. She continued that she used to be more extroverted, but that is no longer the case. She explained that she used to get excited about things, but now she feels overwhelmed. She detailed that she has a loss of interest in planning for her future, including attending school or meeting other students. Ms. Shuster remarked that she hopes to be able to return to school in the next one to two years and hopes to be able to prioritize school when she returns.

Ms. Shuster added that she puts herself at risk on occasion by going to clubs that are not in the safest areas and drinking. She related that doing this gives her instant relief, as she feels she can blend into the crowd and not really interact with anyone.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-30

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Records Review

### Tulane University

11/16/2021: Records indicate that Tulane University issued a mutual No Contact Order between Ms. Shuster and Mr. Levy.

12/10/2021: Ms. Deanna Robertson, case manager, recorded a violation of the No Contact Order by Mr. Levy. It was noted that Mr. Levy contacted Ms. Shuster via social media and showed up at Ms. Shuster's dormitory building, shouting her name when she exited her building. Ms. Shuster supplied text messages from Mr. Levy that were sent after the No Contact Order was in place. Records indicate that Ms. Robertson discussed a safety plan with Ms. Shuster (Bates 00388670).

12/17/2021: Ms. Robertson recorded that Ms. Shuster supplied a screenshot of a message from Mr. Levy asking to meet Ms. Shuster at the parking structure at 3:00 pm.

### State of Louisiana

01/24/2022: Ms. Shuster filed a Petition for Protection from Abuse. She endorsed that Mr. Levy shoved, stalked, threatened, and harassed her. Ms. Shuster did not check the sexual abuse box on the form (Bates 0000004-0000012).

01/25/2022: The Louisiana Civil District Court issued an Order of Protection (Bates 0000013-0000021).

02/14/2022: Ms. Shuster filed a Consent Order and Injunction with the state of Louisiana (Bates 0000022-0000024).

02/23/2022: The state of Louisiana issued a Permanent Injunction.

## Medical History

Ms. Shuster reported no significant physical health-related issues and is not currently under the care of a physician for physical health issues. She is not currently prescribed a course of medication to treat or manage any disease.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-31

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Mental Health History

Ms. Shuster reported that she has never been psychiatrically hospitalized or attempted suicide. She stated that she has a family history of anxiety and depression with her father and sister. She continued that she was involved in treatment with Dr. Allison Taylor from the ages of 14 to 17 to address issues of anxiety related to school stress and fitting in with others. She explained that she was one of the younger students in her class, given her date of birth. Ms. Shuster remarked that all her struggles were normal teen stuff, but they felt big to her at the time.

31

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-32

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster



**Phone Interview: Ms. Gwenn Lowe**

Ms. Lowe reported that she began treatment with Ms. Shuster in September 2022 and continues to provide therapeutic services to Ms. Shuster. Ms. Lowe stated that Ms. Shuster participates in therapy weekly, is motivated in treatment, and is invested in her healing.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-33

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

She continued that Ms. Shuster initially presented for treatment to address experiences of intimate partner violence in a previous relationship. She explained that Ms. Shuster described physical, emotional, and sexual abuse and stalking by her ex-boyfriend, Mr. Levy. Ms. Lowe conveyed that Ms. Shuster evidenced common trauma-related symptoms of panic, intrusive thoughts, hypervigilance, and emotional struggles. Ms. Lowe remarked that much of the treatment focus was on the sexual assaults, and EMDR was used as a treatment approach. She added that more recently, the treatment has focused on the legal case and the added stress of the case. Ms. Lowe related that the ongoing case has delayed Ms. Shuster's treatment goals in that Ms. Shuster is not able to focus solely on her treatment goals, and trauma-focused treatment with EMDR is currently too overwhelming.

Ms. Lowe recounted that though Ms. Shuster had pre-existing anxiety issues in high school and received treatment for a period, her current symptoms are trauma-related. She noted that she has not diagnosed Ms. Shuster with any DSM-5 diagnosis, as she does not routinely provide a diagnosis, instead focusing on symptoms and functionality. Ms. Lowe submitted that Ms. Shuster's reported symptoms would fit a trauma-related diagnosis in the DSM-5, as Ms. Shuster has been traumatized. ██████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████.

Ms. Lowe indicated that she plans to continue to provide treatment to Ms. Shuster, as Ms. Shuster has more work to do on the trauma experienced during her previous relationship, and she and Ms. Shuster have formed a strong therapeutic bond. She maintained that Ms. Shuster continues to be affected by the abuse and still needs to process it, most notably the sexual abuse. Ms. Lowe conveyed that Ms. Shuster will need ongoing treatment to arrive at a place emotionally where she can return to college classes. She contended that Ms. Shuster will need support during the transition back into college in order to succeed.

Ms. Lowe described that Ms. Shuster would benefit from participation in a group for survivors of sexual abuse/assault in the context of intimate partner violence. She reported that Ms. Shuster is not yet ready to share her experiences in a group setting but will benefit from a group format in the future. Ms. Lowe also stated that Ms. Shuster would benefit from continued compliance with her medication, as it seems to be helpful.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-34

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster



ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-35

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster



35

EXHIBIT 2-36

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Regarding drug use, Ms. Shuster noted that she tried cannabis in high school but did not enjoy it and had no regular use. She recalled that she tried cocaine in college but has had no continued use.

Ms. Shuster submitted that she vaped in high school and college until the summer of 2022. She noted that she is now nicotine-free.

## Collateral Interviews

### Deb Morel (Ms. Morel)

Ms. Morel submitted that Ms. Shuster experienced some anxiety issues at the age of 14. She shared that Ms. Shuster attended a high-performance school and felt pressure at school. She indicated that she and her husband did not put pressure on Ms. Shuster regarding grades but that she put pressure on herself. Ms. Morel maintained that Ms. Shuster was younger than her classmates. She contended that Ms. Shuster complained about anxiety regarding school homework and tests and would become overwhelmed when preparing for ███████████████████████. ███████████████████████████████r ███████████████████████. Ms. Morel reported that Ms. Shuster did not exhibit signs of depression at that time.

Ms. Morel stated that she found out that Ms. Shuster had experienced abusive treatment in her relationship with Mr. Levy. She continued that Ms. Shuster complained that Mr. Levy was being possessive and controlling and wanted to know where she was all the time. She explained that Ms. Shuster disclosed that Mr. Levy was calling and texting multiple times per day and that he would not stop contacting her. She remarked that Ms. Shuster informed her that Mr. Levy was waiting for her outside of her dormitory and that he was violating a mutual No Contact Order that was set out by Tulane University. Ms. Morel added that she advised Ms. Shuster to get an Order of Protection from the state of Louisiana.

Ms. Morel related that, at the time, she did not have a deep understanding of the extent of the abuse by Mr. Levy. She recounted that she first heard about the incidents of sexual abuse after Mr. Levy's attorney contacted her family. Ms. Morel noted that Ms. Shuster did not disclose all the details of the abuse to the family because she was embarrassed and did not want to let her family down. She submitted that Ms. Shuster tends to keep problems to herself.

36

ATTORNEYS' EYES ONLY-HIGHLY CONFIDENTIAL

EXHIBIT 2-37

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Ms. Morel communicated that in the spring of 2022, Ms. Shuster missed a lot of classes, and her grades were low. Ms. Morel shared that after Ms. Shuster returned home, she observed that Ms. Shuster had difficulty sleeping, lacked motivation, and avoided going out. She disclosed that Ms. Shuster declined any invitation to engage in an activity, and her mood was low. Ms. Morel indicated that Ms. Shuster eventually started going out and would not return home at night, causing her and her husband to be very worried. She maintained that she found out later that Ms. Shuster was drinking heavily and then staying at a friend's house. She contended that Ms. Shuster never engaged in these behaviors prior to college and never missed her curfew or came home intoxicated. Ms. Morel described that she was worried about Ms. Shuster, and the family started family therapy with Dr. Evans.

Ms. Morel reported that Ms. Shuster has had a difficult time moving forward and dealing with her symptoms. She stated that Ms. Shuster seemed relieved to leave school and come home despite missing her friends. She continued that being back on campus was too triggering for Ms. Shuster. Ms. Morel explained that Ms. Shuster continues to experience nightmares about Mr. Levy. She remarked that Ms. Shuster becomes upset when she hears Mr. Levy's name and avoids talking about the abusive relationship.

**Mike Shuster (Mr. Shuster)**

Mr. Shuster related that Ms. Shuster disclosed that her ex-boyfriend, Mr. Levy, was repeatedly calling, texting, and showing up at her dormitory after she broke off the relationship. He recounted that Ms. Shuster was highly distressed and afraid.

Mr. Shuster noted that Ms. Shuster returned home in December and was obviously on edge, nervous, and anxious. He recalled that Ms. Shuster appeared troubled and was not herself. He submitted that he did not know the extent of the abusive behavior until Mr. Levy filed a lawsuit against Ms. Shuster.

Mr. Shuster shared that Ms. Shuster did not initially disclose the extent of the abuse experienced in her relationship with Mr. Levy because she was embarrassed and ashamed. He disclosed that Ms. Shuster has always valued managing things on her own. He indicated that given the sexual nature of much of the abuse experienced by Ms. Shuster, she was hesitant to share the details with him.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-38

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Mr. Shuster maintained that after the abuse was more fully disclosed, he noticed Ms. Shuster losing weight and becoming quite thin. He contended that he was concerned about Ms. Shuster, who seemed "deeply troubled." Mr. Shuster described that Ms. Shuster was withdrawn, anxious, and depressed. He reported that Ms. Shuster self-isolated and appeared fatigued and unhappy. He stated that Ms. Shuster was less social and less engaged than before the relationship with Mr. Levy. He continued that following the relationship, Ms. Shuster was using alcohol to feel better. Mr. Shuster explained that Ms. Shuster avoided talking about the abuse and would leave the room if there was something on television depicting or discussing sexual assault.

Mr. Shuster remarked that Ms. Shuster continues to struggle with anxiety and low mood. He added that Ms. Shuster appears less upbeat and seems to lack energy and is not as social as she was prior to the relationship with Mr. Levy. He noted that she and has fewer friends with whom she communicates.

Mr. Shuster recounted that Ms. Shuster experienced some anxiety related to school performance in high school, but her current level of anxiety appears to be much higher and is off the "register." He conveyed that the experience of abuse has so impaired Ms. Shuster that it has impacted her functioning and ability to cope.

Mr. Shuster expressed that, ultimately, Ms. Shuster has gone through something very traumatic at such a young age. He noted that this should be a time in Ms. Shuster's life when she should be happy, having fun and being a normal college student. Mr. Shuster recalled that all of this was taken away from her, and it would be a while before she could put it all behind her.

**Genevieve Shuster (Ms. G. Shuster)**

Ms. G. Shuster submitted that she first learned of Ms. Shuster's abuse experiences from her parents. She shared that the stalking was disclosed first, and she found out about the emotional and sexual abuse at a later point. Ms. G. Shuster disclosed that she was not surprised that Ms. Shuster did not initially share the extent of the abuse by Mr. Levy. She indicated that Ms. Shuster was embarrassed and ashamed about what happened to her. She maintained that the sexual assaults were not something Ms. Shuster would ever have wanted her parents to know.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-39

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Ms. G. Shuster maintained that she has seen Ms. Shuster more frequently recently, as Ms. G. Shuster is living at home with the family. She contended that she noticed that Ms. Shuster is withdrawn and spends a lot of time alone, watching television most of the day. She reported that if Ms. Shuster interacts with the family, it is only for brief periods. Ms. G. Shuster conveyed that Ms. Shuster is not going out or socializing much and appears to have lost interest in things she used to enjoy. She stated that Ms. Shuster had not made any effort to develop a friend group in New York. Ms. G. Shuster continued that she is concerned that Ms. Shuster is depressed, as she has lost weight and appears thin.

Ms. G. Shuster explained that Ms. Shuster is not yet able to return to school or find work. She remarked that Ms. Shuster is not at a place that would allow her to live independently of her family. She added that Ms. Shuster's return to school would be a slow process.

## Psychological Test Data

The assessment measures chosen for the current evaluation are widely accepted in the field of psychology to aid in the assessment of claimed psychological difficulties. Although psychological assessment data and the resulting hypotheses and interpretations provide an empirical foundation for Ms. Shuster's overall psychological assessment, this information should not be given greater weight than or considered in isolation from other sources of information, such as clinical interviews, collateral reports, and records.

### Adverse Childhood Experience Questionnaire

- Ms. Shuster completed the ACE questionnaire, a 10-item screening test used to measure childhood trauma, including physical abuse, verbal abuse, sexual abuse, physical neglect, and emotional neglect. Each affirmative answer is assigned one point. At the end of the questionnaire, the points are totaled for a score out of 10, known as the ACE score. The higher the number of negative childhood or adolescent events, the higher the risk of physical and mental health issues later in life, including heart disease, cancer, diabetes, impaired brain development, impaired immune system, teen pregnancy, suicide, poverty, depression, anxiety, substance abuse, suicide, and other mental-health-related issues. The usual cutoff for the ACE is a score of 4, and scores above that put an individual at risk for future medical and mental health issues.

39

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Ms. Shuster obtained a score of zero, indicating no adverse childhood events in the home prior to the age of 18.

## Beck Depression Inventory-2

- Ms. Shuster completed the BDI-2, a 21-item self-report screening test for depression that can differentiate depressed from non-depressed individuals. It can be used as an indicator of the severity of current depression.

- Ms. Shuster obtained a score of 33 out of a possible 63, indicating a *severe* elevation in depression as measured over the preceding two-week period. Scores in the range of 29 to 63 indicate a severe level of depression.

- Ms. Shuster endorsed low mood, pessimism regarding the future, feelings of failure, a lack of pleasure from activities, feelings of being punished, loss of confidence in self, an inability to cry, suicidal thoughts without a current plan or intent, irritability, worthlessness, decreased appetite, difficulty maintaining restful sleep, fatigue, and loss of interest in sex.

## Beck Anxiety Inventory

- Ms. Shuster completed the BAI, a self-report measure for anxiety. Individuals respond to 21 items, each describing a common symptom of anxiety. The respondent is asked to rate how much they have been bothered by each symptom over the past week on a 4-point scale ranging from 0 to 3. The items are summed to obtain a total score ranging from 0 to 63. Each item is descriptive of subjective, somatic, or panic-related symptoms of anxiety.

- The BAI has been found to discriminate well between anxious and nonanxious diagnostic groups in various clinical populations. The measure has been validated in several countries, with studies suggesting it is reliable and valid in numerous cultures.

- Ms. Shuster obtained a score of 45 out of a possible 63, indicating a *severe* elevation in anxiety. Scores in the range of 26 to 63 indicate a severe level of anxiety.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-41

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## PTSD Checklist for DSM-5 with Criterion A

- Ms. Shuster completed the PCL-5, a 20-item self-report measure that corresponds to the Diagnostic and Statistical Manual of Mental Health Disorders, Fifth Edition (DSM-5) symptomatic criteria for PTSD. The respondent is asked to identify the "worst" or most bothersome event. The measure then directs the respondent to rate symptoms that relate to the identified event. The self-report rating scale is 0 to 4 for each symptom, including *not at all, a little bit, moderately, quite a bit, and extremely*, and is based on the past 30 days. Research suggests a cut-off score of 33 to 34 as indicative of probable PTSD across samples.

- Ms. Shuster identified the worst event experienced as "abusive relationship and sexual violence." She scored 64 out of a possible 80, and her endorsed symptoms suggest the presence of posttrauma symptoms above the normal cut-off of 33 to 34 on this measure.

## Minnesota Multiphasic Personality Inventory-3

- Ms. Shuster was assessed using the MMPI-3, an objective test comprising 335 true/false items that assess symptoms, attitudes, and beliefs related to emotional and behavioral problems. The MMPI-3 contains a number of validity scales.

- Ms. Shuster produced scorable responses to all test items, indicating that she responded relevantly to the test items based on their content. Validity indicators on the MMPI-3 suggested that Ms. Shuster endorsed symptoms rarely reported by those with genuine, severe psychopathology. This pattern can also occur in those with genuine, severe psychological issues. In addition, Ms. Shuster reported a larger number of somatic symptoms than is normally reported by those with a significant medical history. She did not report significant medical problems, and thus, there may be over-reporting concerns. The MMPI was not invalidated by this tendency, but some caution is warranted when considering Ms. Shuster's reported level of psychopathology.

- Ms. Shuster reported a strong psychophysiological component to her somatic complaints. Her profile suggests that she may be prone to developing physical

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-42

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

symptoms in response to stress. She reported that she experiences unhappiness, overwhelm, depressed mood, hopelessness, and insecurity and is self-disparaging.

- Ms. Shuster's profile indicated that she experiences general anxiety, nightmares, lack of positive emotion, worry, and lack of interest.

- Interpersonally, Ms. Shuster reported passivity, submissiveness, and shyness. She may be submissive in relationships with others and anxious in social situations.

## Miller Forensic Assessment of Symptoms Test

- Ms. Shuster was administered the M-FAST, a brief screening measure designed to detect feigned mental illness in forensic settings by assessing individual response styles. A cutoff score of 6 on the M-FAST is commonly recommended as optimal for diagnostic accuracy based on a variety of clinical (including forensic) and non-clinical samples.

- Ms. Shuster obtained a score on the M-FAST consistent with an individual who is not overstating psychological symptoms.

## Detailed Assessment of Posttraumatic Stress

- Ms. Shuster completed the DAPS, a 104-item test used to assess trauma exposure and responses to trauma. An individual's test scores are measured against individuals from the general population with at least one trauma exposure. The test measures a range of posttrauma responses associated with a specific trauma event and has two validity scales: *Positive Bias* and *Negative Bias*. The DAPS generates a "probable" diagnosis of PTSD in addition to measuring symptom severity. T-scores of 65 and above are considered clinically significant on this assessment measure. T-scores of 60 to 64 indicate elevated stress that may or may not be clinically meaningful but is an area for treatment consideration.

- Ms. Shuster's responses on the assessment were valid, with no overreporting or underreporting concerns. She indicated that her index trauma was "sexual abuse and physical abuse by Jacob." All responses on the DAPS items relate to the index trauma. Ms. Shuster evidenced clinical elevations (65 and above) on the following clinical scales:

42

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- o **Reexperiencing:** Includes intrusive thoughts, flashbacks, memories, and thoughts regarding the traumatic event, as well as psychological distress to trauma-triggering events.

- o **Avoidance—Effortful/Numbing:** Includes attempts to avoid people, places, and situations that may trigger intrusive experiences and may include attempts to suppress thoughts and feelings and the avoidance of certain social situations.

- o **Hyperarousal:** Includes sleep disturbances, irritation, anxiety, irritability, hypervigilance, and startle responses.

- o **Posttraumatic Stress:** Includes the sum of reexperiencing, avoidance, and hyperarousal and is an indication of overall trauma-related symptoms.

- o **Posttraumatic Impairment:** Includes having trouble at work, at school, in social situations, in relationships, or in other aspects of one's life. This score can be used as an indication of overall functional impairment.

## Trauma Symptom Inventory-2

- The TSI-2 is used to evaluate acute and chronic posttraumatic symptomatology, including the effects of rape, spousal abuse, physical assault, combat experience, major accidents, natural disasters, and the lasting sequelae of childhood abuse and other early traumatic events. The various scales of the TSI-2 assess a wide range of psychological impacts.

- Ms. Shuster's results indicate that she had elevations on the following scales that were *clinically elevated*, i.e., a T-score equal to or greater than 65, representing an above-average endorsement that is likely to have clinical implications and be a focus of current or future treatment:

  - o **Intrusive Experiences:** This scale assesses the existence of intrusive reactions and symptoms, including nightmares, unwanted distressing memories, and unpleasant repetitive thoughts. These symptoms are tied to an upsetting event, usually a psychological trauma.

  - o **Defensive Avoidance:** Elevated scores on this scale indicate attempts to avoid or suppress painful thoughts and memories associated with a

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-44

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

distressing event. Individuals with high scores consciously attempt to avoid thoughts or feelings as a way to manage posttraumatic distress.

o **Anxious Arousal:** This scale reflects symptoms of anxiety, including fears, phobias, panic, and hyperarousal. This scale has two subscales: anxious arousal–hyperarousal and anxious arousal–anxiety. High scores on these scales are associated with flight-or-fight responses, worry, and fearful preoccupations.

o **Trauma:** This scale most closely aligns with the DSM-5 PTSD symptoms and includes scales of Anxious Arousal, Defense Avoidance, Intrusive Experiences, and Dissociation.

o **Impaired Self-Reference—Reduced Self-Awareness**: This scale measures difficulties with an inadequate sense of self, confusion over one's thoughts and beliefs, and identity problems.

## Personality Assessment Inventory

- The PAI is designed to aid in generating information for use in diagnosing, treating, and screening for psychopathology. The PAI covers constructs most relevant to a broad-based assessment of mental disorders.

- Response-style scales of the PAI indicated that Ms. Shuster responded to the test items in a consistent manner, demonstrating that she was attentive and involved in the testing. Response styles indicators fall in the normal range, suggesting that Ms. Shuster responded in a reasonably forthright manner and did not attempt to present an inaccurate impression that was either more negative or more positive than the clinical picture would warrant.

- Ms. Shuster's PAI profile indicated significant elevations in a number of scales, including anxiety. Her profile suggested marked anxiety and tension, rumination, social withdrawal, difficulties with concentration and attention, and fatigue.

- Ms. Shuster's profile indicated that she might be experiencing fear, hypervigilance and monitoring of the environment, avoidance of a feared object or situation, distrust, and recurrent episodes of anxiety. Mr. Shuster described uncertainty about major life issues and purpose. She may have an unstable sense of self and is preoccupied with

44

EXHIBIT 2-45

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

being abandoned or rejected by those around her. She reported alcohol use that has caused occasional problems in her life and concerns about health matters with minor physical symptoms, such as headaches, gastrointestinal problems, or sweating. Ms. Shuster appears to have a poorly established self-concept, and her self-esteem is generally low. She is likely to be self-conscious in social interactions and uncomfortable asserting herself. She may be described as passive, unassuming, and sensitive to the appraisal of others.

## Summary of Testing

Overall, Ms. Shuster responded to the test items consistently, demonstrating that she was attentive and involved in the testing. However, her MMPI-3 profile raised some concerns about the overreporting of symptoms, indicating that Ms. Shuster may have reported a larger-than-average number of symptoms not often reported by the normative sample, specifically somatic complaints and emotional functioning. This could result from severe psychopathology or could reflect exaggeration of symptoms. Therefore, her scores on the MMPI scales need to be viewed with some caution. Ms. Shuster's performance on a test of response bias did not, however, indicate a high likelihood of feigned psychopathology, nor were there response bias concerns indicated on other assessment measures.

Ms. Shuster reported depressive and anxious symptoms. She tends to experience worry and anxiety and has difficulties controlling her anxiety. She likely has low mood, loss of interest in activities, fatigue, somatic complaints, low self-esteem, and sleep problems.

Ms. Shuster's self-concept is passive, submissive, and poorly established. She is likely to be uncomfortable around others and to struggle to assert herself.

Ms. Shuster's test results, taken together, indicated the presence of trauma-related symptoms associated with PTSD, general anxiety, and depression. These findings were supported by the DAPS, TSI-2, and PAI.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-46

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# VI.  Opinions and Analysis

## Opinion 1

After considering confirming and disconfirming information, data from the current evaluation suggested that Ms. Shuster experiences several mental health issues, including PTSD, anxiety, and depression. Ms. Shuster's self-reported symptoms of posttrauma were generally supported by test findings during this evaluation, including the PAI, TSI-2, and the DAPS, which are assessments designed to determine psychopathology and possible elevations in trauma-related symptoms, most notably the TSI and DAPS. Ms. Shuster's current symptoms and their impact on her daily functioning reportedly had onset following the alleged emotional, physical, and sexual abuse and stalking by Mr. Levy. Ms. Shuster was first diagnosed with PTSD by Dr. Lori Evans in 2022. She was then diagnosed with PTSD by her psychiatrist, Dr. Benito Figueroa, in June 2023. Ms. Shuster's current therapist, Gwenn Lowe, further supported a trauma-related diagnosis. A PTSD diagnosis was supported by data obtained during this evaluation.

Criterion A: The physical, emotional, and sexual assaults by Mr. Levy would constitute a DSM-5 criterion—a stressor that is a necessary predicate for the development of posttraumatic symptoms.

Criterion B: The presence of one (or more) of the following intrusive symptoms:

1) Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s) (e.g., memories of the abuse pop into her mind)
2) Recurrent, distressing dreams in which the content and/or affect of the dream is related to the traumatic event(s) (e.g., fearing someone will break into the home and harm her or Mr. Levy tries to talk to her, and she cannot get away from him)
3) Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s) (e.g., feeling sick to her stomach with thinking or talking about the previous abuse or experiencing difficulties with sexual intimacy)

Criterion C: Persistent avoidance of stimuli associated with the traumatic event(s):

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-47

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

1) Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s) (e.g., distracting self with podcasts, music, and television to avoid thinking about the abuse or avoidance of talking about the past abuse)

2) Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, and situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s) (e.g., feeling uncomfortable being in public, discomfort with men looking at her, and avoidance of the Tulane campus)

Criterion D: Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s):

1) Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., distrusting others, assuming the worst of others, or fearing she may be hurt)

2) Persistent distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame him/herself or others (e.g., feelings of being to blame or responsible for the abuse, as she did not disclose or leave the relationship)

3) Persistent negative emotional state (e.g., feeling anger/guilt regarding emotional difficulties and fearing others)

4) Markedly diminished interest or participation in significant activities (e.g., avoiding socializing or self-isolating)

5) Persistent inability to experience positive emotions (e.g., being unable to feel happy for more than brief periods)

Criterion E: Marked alterations in arousal and reactivity associated with the traumatic event(s):

1) Hypervigilance (e.g., jumpy at any noise, watchful, and looking over her shoulder)

2) Problems with concentration (e.g., difficulties with attention and concentration)

3) Sleep disturbances (e.g., difficulties initiating sleep several times per week)

47

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-48

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Literature on PTSD and other trauma-related diagnoses has demonstrated that PTSD and trauma include symptoms that fall into various factorial clusters. Some symptoms are specific to the source of the trauma and may be viewed as "footprints" to the index trauma (i.e., symptoms that are linked to the trauma in question). These symptoms are more likely to be connected to that trauma.



The scientific literature indicates that PTSD and other trauma responses can certainly occur after a single incident of trauma. This is especially true for survivors of combat trauma and sexual violence. However, studies indicate that there is a higher risk for developing PTSD and other trauma-related sequelae when an individual has experienced trauma that is repetitive and extended over a period of time, as is often observed in ongoing and repetitive domestic violence/intimate partner violence.

Research findings also demonstrate that victims of intimate partner violence are often exposed to different forms of violence within a relationship, known as poly-victimization.

48

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-49

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

The co-occurrence of multiple types of violence is associated with a higher risk to victims for a greater number of adverse mental health outcomes.

Ms. Shuster described multiple incidents of emotional and sexual violence during her one-year relationship with Mr. Levy. She also described several incidents of physical violence during the relationship.

Ms. Shuster's description of sexual assaults experienced during the relationship with Mr. Levy fit the definition of coercive sexual assault. She described numerous incidents of coercive sexual assault and several incidents of sexual assault while asleep. Verbal sexual coercion (VSC), a form of sexual assault, is psychological pressure to have coerced sex. The perpetrator of VCS attempts to verbally wear down or convince the victim to engage in sex by being manipulative, persistent, and/or applying verbal pressure in the hopes that the victim will eventually cease verbal or physical resistance to sex. VSC prevalence rates have been found to be consistently higher than other forms of sexual assault on women. Recent research findings in the U.S. indicate that post-refusal sexual persistence of some type (i.e., verbal pressure, arguments, emotional manipulation, threats, or the use of physical force) is a fairly common experience for U.S. college students.

There are several factors that are uniquely correlated with verbal sexual coercion experience. Research has shown that when compared to women who have been raped, victims of verbal sexual coercion tend to have lower self-esteem, lower assertiveness, and higher social anxiety. Victims of verbal coercion also tend to hold themselves more responsible for this type of sexual assault than do victims of forcible rape and hold the perpetrator less responsible than do victims of forcible rape.

Noteworthy in this case is Ms. Shuster's reports of choking or strangulation by Mr. Levy on several occasions during sex. Strangulation is generally defined as an act whereby someone impedes or restricts the breathing or circulation of the blood of another person by applying pressure to the neck or by blocking the nose or mouth of the other person. Research has shown that strangulation is one of the most terrorizing and lethal forms of violence used by men against their female intimate partners. The act of strangulation symbolizes an abuser's power and control over the victim, most of whom are female. The sensation of suffocating can be terrifying; the victim is completely overwhelmed by the

49

EXHIBIT 2-50

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

abuser. A single traumatic experience of strangulation or the threat of it may instill such intense fear that the victim can get trapped in a pattern of control by the abuser and be made vulnerable to further abuse. Victims of one episode of strangulation are seven times more likely to become homicide victims at the hands of the same partner.

Concerning emotional abuse, Ms. Shuster described name-calling, belittling, and criticism by Mr. Levy. She described controlling behavior by Mr. Levy that included instructing her on how to dress, criticizing her friends, looking through her cell phone, accessing her social media accounts, accusing her of interest in other men, repeated texting and demanding that she respond, and threatening to harm himself.

Numerous research studies have shown that mental health issues, such as suicidal ideation, substance abuse, PTSD, and depression, occur three to five times more frequently in survivors of domestic violence/intimate partner violence than in women who never experienced relationship violence.

Ms. Shuster also reported stalking and harassment by Mr. Levy. The National Center for Victims of Crimes describes stalking as "a course of conduct directed at a specific person that would cause a reasonable person to feel fear." There are multiple definitions of stalking in the literature, but they all generally include at least three features: a pattern of unwanted pursuit, a threat (or perceived threat) to the victim's safety, and the experience of fear on the part of the victim.

The best predictor of stalking duration, according to the literature, is the type of prior relationship shared by the stalker and the victim, with rejected ex-partners thought to be the most persistent and strangers the least. Research indicates that most stalking victims are harassed by a prior intimate partner and that this group of victims is at a higher risk for violence than other stalking victims. Furthermore, many researchers have found a relationship between prior intimate partner stalking and intimate partner violence.

Intimate partner stalking has been found to be particularly dangerous, given that a perpetrator can use knowledge of the victim's schedule, friends, and family to perpetrate the stalking. Not only is ex-intimate partner stalking dangerous, but research has shown that stalking is common after a romantic break-up or separation.

50

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-51

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

The relationship history in prior intimate partner stalking also gives stalkers a wider range of opportunities and tactics to use in stalking, including their intimate knowledge of the victim and their life. Adding to the terror of being stalked by a prior violent partner, there is evidence that intimate partner stalkers are more likely to threaten their victims and follow through on those threats than stalkers targeting non-intimates.

The impact on mental health functioning resulting from stalking has been shown to last long after the stalking has ceased. Victims can suffer from fear of harm, anxiety, panic attacks, depression, flashbacks and intrusive thoughts, PTSD, feelings of helplessness and loss of control, mistrust of others, fear of entering new relationships, social withdrawal, concentration problems, sleep problems, and substance use.

Taken together, the above-reported experiences of sexual assault, emotional abuse, physical assault, and stalking represent multiple incidents of trauma and distress that took place for approximately one year. Based on her self-reported experiences, Ms. Shuster's symptoms are what would be expected with cumulative trauma experiences.

The experience of multiple forms of intimate partner violence and stalking can result in an increased risk for revictimization in the future. The finding that women with previous sexual assault/abuse histories are revictimized at higher rates than women without such histories is quite robust and has been substantiated among a variety of populations of women-including treatment seeking, general community, incarcerated and college student populations. This "revictimization" phenomenon has also been observed in individuals who have a history of domestic/physical assault.

The reasons for the increased risk for re-assault for this population is complex and not clearly understood. However, there are some prominent theories that address the issue. For example, it is believed that individuals experiencing symptoms of an earlier trauma are at an increased risk for re-assault due to decreased attention paid to possible danger cues in the environment that result from dissociative symptoms of posttrauma. In other words, individuals with trauma or trauma related symptoms may not be able to appropriately discern danger in their environment because they are detached or dissociated from what is going on around them. Although these women may experience discomfort in coercive interactions, their difficulty in accurately labeling and responding to danger may cause

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-52

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

them to remain in situations beyond the point at which they could safely escape, thus perpetuating the "cycle of victimization."

Additionally, many individuals with assault/abuse histories may be unable to conceive of themselves as having either personal agency or choice. One would predict that if a child/adolescent cannot find a way to avoid the abuse, she may adopt a position of complete surrender and apathy.

## Opinion 2

Ms. Shuster evidenced significant symptoms of depression in the current evaluation, as evidenced by her self-report of symptoms as well as findings on psychological measures. Ms. Shuster has no reported history of depression, and her symptoms of depression were reported following the relationship with Mr. Levy. Again, if Ms. Shuster's report of events experienced during the relationship with Mr. Levy is taken as accurate, her symptoms of depression are in line with what would be expected given repeated experiences of partner abuse and stalking. Without a previous history of depression and reportedly consistent symptoms since first onset, Ms. Shuster meets the criteria for Major Depressive Disorder (MDD).

According to the DSM-5 criterion A for MDD, five [or more] of the symptoms in criterion A have been present during the same two-week period and represent a change from previous functioning.

1) Depressed mood most of the day, nearly every day, as indicated by either subjective report (e.g., feels sad or empty) or observations made by others (e.g., appears tearful)
2) Markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day (as indicated by either subjective account or observations made by others)
3) Significant weight loss when not dieting or weight gain (e.g., a change of more than 5% body weight in a month) or decrease or increase in appetite nearly every day
4) Insomnia or hypersomnia nearly every day
5) Psychomotor agitation or retardation nearly every day (observable by others, not merely subjective feelings of restlessness or being slowed down)
6) Fatigue or loss of energy nearly every day

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-53

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

7) Feelings of worthlessness or excessive or inappropriate guilt (which may be delusional) nearly every day (not merely self-reproach or guilt about being sick)

8) Diminished ability to think or concentrate or indecisiveness nearly every day (either by subjective account or as observed by others)

9) Recurrent thoughts of death (not just fear of dying), recurrent suicidal ideations without a specific plan, or a suicide attempt or specific plan for committing suicide

Depressive symptoms currently endorsed by Ms. Shuster include the following:

- Sadness
- Loss of interest in activities
- Self-isolation
- Low self-esteem
- Sleep disturbance
- Fatigue
- Appetite disturbance, with decreased or low appetite
- Concentration problems
- Guilt
- Critical of self
- Low energy

Though PTSD and depression share some overlapping symptoms, Ms. Shuster's symptoms warrant a separate diagnosis.

## Opinion 3

Ms. Shuster's mental health symptoms of PTSD and depression have impacted her functioning in several areas, including emotional and behavioral, social and relationship, and academic functioning.

### Emotional and Behavioral Functioning

Ms. Shuster continues to experience trauma-related symptoms of hypervigilance, avoidance behavior, intrusive experiences, and negative cognitions regarding self and others. She experiences watchfulness of her surroundings, fear of being home alone, discomfort going out in public, nightmares and difficulties sustaining restful sleep, and

53

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

upset with reminders of the abuse, with physical responses, including nausea. Ms. Shuster endorses significant depressive symptoms that impact her daily functioning, including self-isolation, loss of interest in most activities, low mood, fatigue, self-blame, low self-esteem, and pessimism regarding the future. Ms. Shuster continues to be medication compliant on Zoloft, 100mg.

## Social and Relationship Functioning

Ms. Shuster described that she does not trust people and assumes the worst of others. She reported that she fears someone may hurt her if she allows it. Ms. Shuster avoids social interactions and self-isolates at home with her parents. Ms. Shuster stated that she is hesitant to meet new people or allow people into her life. She continued that she feels distant from others and worries that others may have ill intent. She explained that all her current relationships pre-existed the relationship with Mr. Levy. Ms. Shuster remarked that she feels she becomes submissive around males, and she loses her power.

## Academic Functioning

Ms. Shuster's academic performance decreased significantly from high school to college. She completed high school with an overall average GPA of 3.48 and a strong composite score on her American College Testing. Ms. Shuster evidenced a significant drop in grades beginning in the fall semester of 2020. She continued to do poorly in class, with numerous withdrawals and unofficial withdrawals through the spring semester of 2023, when she left Tulane. Though it is unclear what other factors may have impacted Ms. Shuster's academic performance, she began a relationship with Mr. Levy in the fall of 2020. She reported that she began to miss classes and spend all her time with Mr. Levy. Ms. Shuster reported a lack of motivation for school and a loss of interest in her grades over time in the relationship.

Ms. Shuster has not yet returned to school. She reported that her emotional struggles continue, and she is not ready to pursue further education at this time. She detailed that she has lost interest in planning for her future, including attending school or meeting other students. Ms. Shuster remarked that she hopes to be able to return to school in the next one to two years and to prioritize school when she returns.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-55

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Ms. Shuster's current treatment provider, Ms. Lowe, concurs that Ms. Shuster is not yet ready to return to college, given her ongoing mental health symptoms.

Research findings indicate that experiencing psychological aggression by an intimate partner negatively impacts college women's academic performance. Research has shown that survivors of intimate partner violence struggle with academic performance, engagement in academics, and commitment to remain in school.

## Opinion 4

Based on the continued trauma-related and depressive symptoms outlined above, it is recommended that Ms. Shuster participate in continued individual, trauma-specific treatment for at least an additional three years. She will very likely require ongoing medication management for at least three years or as determined by her medication provider. Ms. Shuster is currently prescribed Zoloft 100mg but may need different or additional medications as treatment continues. Ms. Shuster would also benefit from participation in group treatment for survivors of intimate partner violence with a sexual abuse component. Lastly, Ms. Shuster is likely to require periodic or "pulsed" treatment later in life during additional adverse events or other life transitions or stressors. Involvement in periodic treatment following partner violence, including sexual assault, is common, and a return to treatment is observed in the majority of those physically or sexually victimized.

In the event that Ms. Shuster is able to attend college classes in the future, she will benefit from academic accommodations to ensure her ability to complete college. Such accommodations could include flexible grading, the ability to attend remote courses, limited/reduced course loads, extensions on assignments, mental health and case management support on campus, and possible periodic breaks from school.

### Individual Treatment

Ms. Shuster would benefit from regular weekly sessions with an experienced provider specializing in interpersonal violence, sexual assault, and stalking and who is well-versed in trauma-related therapeutic approaches. Ms. Shuster has been receiving treatment from

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-56

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Ms. Gwenn Lowe since September 2022 and reportedly feels comfortable with this provider.

In terms of recommended and efficacious treatment modalities, the "Consensus Statement Update on Posttraumatic Stress Disorder" from the International Consensus Group on Depression and Anxiety recommends exposure therapies as first-line psychological treatments for PTSD and other trauma-related diagnoses.

Cognitive-behavioral therapy (CBT) for PTSD has thus far received the most empirical support for adults, children, and adolescents. It has been shown to be effective in the presence of significant mental health comorbidities and when it is administered many years after the development of symptoms. Commonly utilized CBT protocols can include processing therapy and prolonged exposure. In general, CBT for PTSD and trauma-related diagnoses includes psychoeducation about PTSD for patients and their significant others, cognitive restructuring to address self-blaming and depressive thoughts, anxiety management to address hyperarousal symptoms, behavioral exposure to address avoidance symptoms, and imaginal exposure to disarm the haunting and intrusive power of the trauma(s) itself. The theory is that facing the traumatic memory in a planned way eventually wears down the negative emotions connected to the memory so that remembering or being reminded is not as upsetting.

Also found to be an efficacious treatment for trauma-related issues and comorbid depression is EMDR therapy. EMDR is a psychotherapy that enables people to heal from symptoms and emotional distress resulting from disturbing life experiences; it is an eight-phase treatment. Eye movements (or other bilateral stimulation) are used during one part of the session. After the clinician has determined which memory to target, they ask the client to hold different aspects of that event or thought in their mind and to use their eyes to track the therapist's hand as it moves back and forth across the client's field of vision. As this happens, for reasons believed by a Harvard researcher to be connected with the biological mechanisms involved in rapid eye movement sleep, internal associations arise, and the client begins to process the memory and disturbing feelings. In successful EMDR therapy, the meaning of painful events is transformed on an emotional level. There has been much research into EMDR therapy, and it is now recognized by organizations such as the American Psychiatric Association, the World Health Organization, and the

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-57

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Department of Defense as an effective form of treatment for trauma and other disturbing experiences.

Ms. Lowe is trained in EMDR therapy and is currently working on an advanced certification in EMDR.

## Psychiatric Treatment

Ms. Shuster began medication management on 06/22/2003 with Dr. Benito Figueroa. At that time, Ms. Shuster was noted to have recurrent nightmares, muscle tension related to stress, watchfulness when out in public, concerns for safety, and lack of motivation. It was further noted that Ms. Shuster had been physically, emotionally, and sexually abused in a previous relationship and subsequently stalked by her ex-boyfriend after ending the relationship. Dr. Benito Figueroa started Ms. Shuster on a regimen of 50 mg of Zoloft.

Dr. Benito Figueroa's records of 08/24/2003 indicated that Ms. Shuster's Zoloft was increased from 50 mg to 100 mg due to ongoing anxiety symptoms. Dr. Benito Figueroa's records noted that Ms. Shuster will be seen for medication management every two to four weeks (Figueroa 0000001).

Research regarding psychotropic medication and PTSD treatment has found that some individuals can be titrated off psychotropic medications over time following stabilization, but others may need to continue on medications for years. There is some evidence to suggest that the risk of relapse following discontinuation of pharmacotherapy in individuals with chronic PTSD or trauma-related symptoms demonstrates the need for long-term treatment.

Ms. Shuster would benefit from at least three years of medication management, with the understanding that this is a conservative estimate. Ms. Shuster may need medication management for longer if symptoms reoccur or worsen after medication termination, as happens with some individuals.

The cost of medications can vary depending on the type and dosage. The National Center for PTSD recommends the use of Zoloft, Paxil, and Effexor.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-58

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

## Group Treatment

Ms. Shuster would benefit from participation in a group format for a period of at least one year. Group therapy for survivors of intimate partner violence and sexual-type crimes has been found to be very efficacious. Scientific studies have repeatedly proven that group therapy reduces negative consequences and trauma in adolescents and adults. The supportive relationships established in the group setting mitigate the social isolation that characterizes many victims and reduce feelings of shame and self-blame. Perhaps most important to the recovery process, group interventions improve a victim's personal resources and skills for coping with the emotional trauma of violence.

## Pulsed Interventions

Ms. Shuster, like other victims of physical and sexual assault, will very likely require periodic treatment beyond the initial prescribed three-year treatment. It is quite common for survivors of partner violence sexual abuse/assault to experience life transitions, even positive milestones, as triggering events related to the earlier trauma. The need for pulsed interventions in the sexual assault population is well supported in the literature and is a common occurrence.

## Academic Accommodations

In the event that Ms. Shuster returns to school, she would likely benefit from academic accommodations in order to ensure her ability to successfully complete her degree. Such accommodations could include part-time attendance, flexible grading, the ability to attend remote courses, limited/reduced course loads, extensions on assignments, and mental health and case management support on campus. Ms. Shuster may also need to take a semester off from her studies should her mental health issues increase with the stress of college and the necessary transitions that come with being a student. Thus, it may take her longer than expected to complete a degree.

## Summary and Prognosis

Ms. Shuster reported that she was involved in an intimate relationship with Mr. Levy from October 2020 to November 2021. She stated that Mr. Levy physically, emotionally, and sexually abused her on numerous occasions during the relationship. She further conveyed

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-59

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

that Mr. Levy stalked and harassed her after she ended the relationship. Ms. Shuster sought an Order of Protection from the state of Louisiana, which was issued based on her reports of abuse.

Based on all data collected and reviewed during this evaluation, Ms. Shuster's reported symptoms are consistent with PTSD and depression. Her symptoms were supported by psychological testing during this evaluation. Ms. Shuster was also diagnosed with a trauma-related disorder based on DSM-5 criteria by three mental health providers. Ms. Shuster's symptoms have impacted her daily functioning.



If Ms. Shuster's recall of events and experiences with Mr. Levy are accurate, it seems unlikely ███████████████████████████) could account for all the symptoms that Ms. Shuster and her providers were reporting in 2022. What is probable, to a reasonable degree of scientific and medical probability, is that the majority of Ms. Shuster's mental health issues are related to the polyvictimization and repetitive nature of the abuse experienced in the relationship with Mr. Levy. Studies investigating the types of trauma and their impact on PTSD indicate that there is a higher risk for developing PTSD and other trauma-related sequelae when an individual has experienced trauma that is repetitive and extended over a period of time, as is often observed in ongoing and repetitive domestic violence/intimate partner violence. In addition, ███████████████████ has not been a primary focus in her treatment, according to Ms. Shuster's medical records.



59

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-60

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster



Finally, as outlined above in the trauma symptoms that meet DSM-5 criteria for PTSD, many of Ms. Shuster reported symptoms of trauma are directly connected ("footprints") with the abusive relationship (i.e., memories of the abuse pop into her mind; fearing someone will break into the home and harm her or Mr. Levy tries to talk to her, and she cannot get away from him; feeling sick to her stomach when thinking or talking about the previous abuse or experiencing difficulties with sexual intimacy; and feelings of being to blame or responsible for the abuse, as she did not disclose or leave the relationship). Therefore, it is reasonable to conclude that Ms. Shuster's posttrauma symptoms are more likely connected to the events experienced in the relationship with Mr. Levy.

Ms. Shuster has been consistent and motivated in treatment with her individual therapist, Gwenn Lowe, participating in trauma-related treatment, which is ongoing. She has regular visits with her psychiatrist and is medication-compliant on Zoloft 100 mg. With the above recommendations for treatment and her strong family support, Ms. Shuster's prognosis for recovery is good.

Ms. Shuster reported some increased stress related to the current civil case. She has noted an increase in anxiety levels. For any plaintiff or defendant in a tort case, there is the possibility of "critogenic" (law-caused) emotional harm that is intrinsic and inescapable in the legal process. Individuals with trauma-related symptoms tend to relive the trauma and experience the psychological symptoms caused by the trauma, which can slow or postpone the healing process.

It is important to note, however, that the settlement of a case does not cause sudden remission of trauma sequelae. Rather, settlement removes some anxiety associated with the trauma and the litigation process.

60

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-61

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

*The opinions offered in this report are based on a reasonable degree of psychological certainty, and the opinions provided above may change with the provision of additional information.*

If I may be of further service in this matter, please do not hesitate to contact me.

Respectfully submitted,

Donna Peters, Psy.D.

Licensed Clinical Forensic Psychologist

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-62

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# Appendix A

## Diagnostic Criteria

### Posttraumatic Stress Disorder (309.81)

A. Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:

1) Directly experiencing the traumatic event(s)

2) Witnessing, in person, the event(s) as it occurred to others

3) Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental.

4) Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains or police officers repeatedly exposed to details of child abuse)

B. Presence of one (or more) of the following intrusive symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:

1) Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s)

**Note:** In children older than six years, repetitive play may occur in which themes or aspects of the traumatic event(s) are expressed.

2) Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s)

**Note**: In children, there may be frightening dreams without recognizable content.

3) Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.

**Note:** In children, trauma-specific reenactment may occur in play.

4) Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s)

Appendix A

**Diagnostic Criteria**

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-63

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

5) Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s)

C.  Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:

1) Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s)

2) Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, or situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s)

D.  Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1) Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia and not to other factors such as head injury, alcohol, or drugs)

2) Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., I am bad, no one can be trusted, the world is completely dangerous, or my whole nervous system is permanently ruined)

3) Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others

4) Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame)

5) Markedly diminished interest or participation in significant activities

6) Feelings of detachment or estrangement from others

7) Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings)

E.  Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1) Irritable behavior and angry outbursts (with little or no provocation), typically expressed as verbal or physical aggression toward people or objects

2) Reckless or self-destructive behavior

Appendix A

**Diagnostic Criteria**

63

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-64

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

    3) Hypervigilance

    4) Exaggerated startle response

    5) Problems with concentration

    6) Sleep disturbances (e.g., difficulty falling or staying asleep or restless sleep)

F. The duration of the disturbance (criteria B, C, D, and E) is more than one month.

G. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

H. The disturbance is not attributable to the physiological effects of a substance (e.g., medication or alcohol) or another medical condition.

**Dissociative symptoms:** Specify if the individual's symptoms meet the criteria for PTSD, and in addition, in response to the stressor, the individual experiences persistent or recurrent symptoms of either of the following:

    a. **Depersonalization:** Persistent or recurrent experiences of feeling detached from and as if one were an outside observer of one's mental processes or body (e.g., feeling as though one were in a dream or feeling a sense of unreality of self or body or of time moving slowly).

    b. **Derealization:** Persistent or recurrent experiences of unreality of surroundings (e.g., the world around the individual is experienced as unreal, dreamlike, distant, or distorted).

    **Note:** To use this subtype, the dissociative symptoms must not be attributable to the physiological effects of a substance (e.g., blackouts or behavior during alcohol intoxication) or another medical condition (e.g., complex partial seizures).

**Delayed expression:** Specify if the full diagnostic criteria are not met until at least six months after the event (although the onset and expression of some symptoms may be immediate).

## Major Depressive Disorder (296.32)

A. Five (or more) of the following symptoms have been present during the same two-week period and represent a change from previous functioning, and at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure.

Appendix A

**Diagnostic Criteria**

64

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-65

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

1) Depressed mood most of the day nearly every day as indicated by either subjective report (e.g., feels sad or empty) or observation made by others (e.g., appears tearful)

2) Markedly diminished interest or pleasure in all, or almost all, activities most of the day nearly every day (as indicated by either subjective account or observation made by others)

3) Significant weight loss when not dieting or weight gain (e.g., a change of more than 5% of body weight in a month) or decrease or increase in appetite nearly every day

4) Insomnia or hypersomnia nearly every day

5) Psychomotor agitation or retardation nearly every day (observable by others, not merely subjective feelings of restlessness or being slowed down)

6) Fatigue or loss of energy nearly every day

7) Feelings of worthlessness or excessive or inappropriate guilt (which may be delusional) nearly every day (not merely self-reproach or guilt about being sick)

8) Diminished ability to think or concentrate or indecisiveness nearly every day (either by subjective account or as observed by others)

9) Recurrent thoughts of death (not just fear of dying), recurrent suicidal ideations without a specific plan, or a suicide attempt or specific plan for committing suicide

B. The symptoms do not meet the criteria for a mixed episode.

C. The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D. The symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse or a medication) or a generalized medical condition.

E. The symptoms are not better accounted for by bereavement, and the symptoms persist for longer than two months or are characterized by marked functional impairment, morbid preoccupation with worthlessness, suicidal ideation, psychotic symptoms, or psychomotor retardation.

Appendix A

**Diagnostic Criteria**

ATTORNEYS' EYES ONLY-HIGHLY CONFIDENTIAL

EXHIBIT 2-66

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# Appendix B

## References

In addition to my 25 years of experience working in the field of trauma and trauma-related response, reviewing hundreds of scientific articles and books, and participating in numerous workshops, the following articles were reviewed as part of this evaluation.

Abbey, A., BeShears, R., Clinton-Sherrod, A. M., & McAuslan, P. (2004). Similarities and differences in women's sexual assault experiences based on tactics used by the perpetrator. *Psychology of Women Quarterly*, 28, 323–332.

Banyard, V. L., Demers, J. M., Cohn, E. S., Edwards, K. M., Moynihan, M. M., Walsh, W. A., & Ward, S. K. (2020). Academic correlates of unwanted sexual contact, intercourse, stalking, and intimate partner violence: An understudied but important consequence for college students. *Journal of Interpersonal Violence*, *35*(21–22), 4375–4392.

Breitenbecher, K. H. (1999). The association between the perception of threat in a dating situation and sexual victimization. *Violence and Victims*, 14, 135–146.

Brown, A., Testa, M., & Messman-Moore, T. (2009). Psychological consequences of sexual victimization resulting from force, incapacitation, or verbal coercion. *Violence Against Women*, *15*(8), 898–919.

Churcher, F., & Nesca, M. (2013). Risk Factors for Violence in Stalking Perpetration: A Meta-Analysis. *Journal of Social Sciences*, 7, 100–112.

Davis, K. E., Coker, A. L., & Sanderson, M. (2002). Physical and mental health effects of being stalked for men and women. *Violence and Victims*, *17*(4), 429–443.

Diette, T. M., Goldsmith, A. H., Hamilton, D., Darity Jr, W., & McFarland, K. (2014). Stalking: Does it leave a psychological footprint? *Social Science Quarterly*, *95*(2), 563–580.

Edwards, K. M., & Gidycz, C. A. (2014). Stalking and psychosocial distress following the termination of an abusive dating relationship: A prospective analysis. *Violence Against Women*, *2011*, 1383–1397.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-67

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Franklin, C. (2010). Physically forced, alcohol-induced, and verbally coerced sexual victimization: Assessing risk factors among university women. *Journal of Criminal Justice*, 149–159.

Gilmore, A., Schact, R., George, W., Davis, K., Norris, J. & Heiman, J. (2014). Verbal sexual coercion experiences, sexual risk, and substance use in women. *Journal of Aggression, Maltreatment and Trauma*, 23, 725–739.

Jordan, C. E., Combs, J. L., & Smith, G. T. (2014). An exploration of sexual victimization and academic performance among college women. *Trauma, Violence, & Abuse*, *153*, 191–200.

Katz, J., & Rich, H. (2015). Partner covictimization and post-breakup stalking, pursuit, and violence: A retrospective study of college women. *Journal of Family Violence*, *30*(2), 189–199.

Krebs, C. P., Lindquist, C. H., Warner, T. D., Fisher, B. S., & Martin, S. L. (2007). *The campus sexual assault (CSA) study*. Washington, DC: National Institute of Justice, U.S. Department of Justice.

Katz, J., Moore, J., & Tkachuk S. (2007). Verbal sexual coercion and perceived victim responsibility: Mediating effects of perceived control. *Sex Roles,* 57:235–247.

Livingston, J. Buddie, A., Testa, M., & Tamsen, C. (2004). The role of sexual precedence in verbal sexual coercion. *Psychology of Women Quarterly*, 28, 287–297.

Logan, T. K., & Cole, J. (2007). The impact of partner stalking on mental health and protective order outcomes over time. *Violence and Victims*, *22*(5), 546–562.

Logan, T. K., & Cole, J. (2011). Exploring the intersection of partner stalking and sexual abuse. *Violence Against Women*, *17*(7), 904–924.

McGuire, B., & Wraith, A. (2000). Legal and psychological aspects of stalking: A review. *The Journal of Forensic Psychiatry*, *11*(2), 316–327.

Mechanic, M., Uhlmansiek, M., Weaver, T., & Resick, P. (2000). The impact of severe stalking by acutely battered women: An examination of violence, psychological symptoms and strategic responding. *Violence and Victims*, *15*(4), 443–458.

Appendix B
**References**
67

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-68

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

Spitzberg, B. H., Marshall, L., & Cupach, W. R. (2001). Obsessive relational intrusion, coping, and sexual coercion victimization. *Communication Reports*, *14*(1), 19–30.

Storey, J., Pina, A. & Williams, C. (2023). The impact of stalking and its predictors: Characterizing the needs of stalking victims. *Journal of Interpersonal Violence,* 38, 11569–11594.

Tamborra, T., Dutton, L., & Terry, K. (2014). Verbally coerced sex: Does she have to say 'no?' *International Review of Victimology*, 227–241.

Testa, M., & Dermen, K. (1999). The differential correlates of sexual coercion and rape. *Journal of Interpersonal Violence*, 14, 548–561.

Tjaden, P. G., & Thoennes, N. (1998). *Stalking in America: Findings from the national violence against women survey* (pp. 1-20). Washington, DC: US Department of Justice Programs, National Institute of Justice.

Tyler KA, Hoyt DR, Whitbeck LG. (1998). Coercive sexual strategies. *Violence and Victims,* 47–61.

Zweig, J., Barber, B., Eccles, J. (1997). Sexual coercion and well-being in young adulthood: Comparisons by gender and college status. *Journal of Interpersonal Violence*. 1997; 12:291–308.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-69

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# Appendix C

## Fee Schedule

Services are furnished on an hourly basis at $450.00 per hour. This specifically includes (but is not limited to) researching, attending conferences, consulting with the client, reviewing documents, organizing documents, analyzing, testing, responding to discovery requests, writing reports, testifying, investigating, reading and signing deposition transcripts, traveling locally (portal-to-portal), waiting, preparing exhibits, preparing demonstrative aids, and preparing to testify at the deposition, trial, hearing, arbitration, and other venues. The expert's time will be tracked and invoiced to the nearest half an hour. In lieu of the above hourly rate, duties that reasonably require overnight travel will be billed at the flat rate of $5,000.00 per day on site. In any and all events, the client will be responsible for all reasonable out-of-pocket expenses, including, but not limited to, traveling, testing, researching, copying, and storing evidence or documents.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL                    EXHIBIT 2-70

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# Appendix D

## Recent Expert Testimony Schedule

### United States Military Courts Martial

1) <u>United States v. Riley Cooper</u> (2019). Sexual assault by a member of the US Armed Forces. Testifying expert for the Government. Peterson AFB, Colorado.

2) <u>United States v. Joey Torres</u> (2019). Sexual assault by a member of the US Armed Forces. Testifying expert for the Government. Buckley AFB, Colorado.

3) <u>United States v. Charles Lisot</u> (2019). Sexual assault by a member of the US Armed Forces. Testifying expert for the Government. RAF Lakenheath, United Kingdom.

4) <u>United States v. Ryan Howard</u> (2019). Sexual assault by a member of the US Armed Forces. Testifying expert for the Government. Ramstein AFB, Germany.

5) <u>United States v. Tyrese Campbell</u> (2023). Domestic violence by a member of the US Armed Forces. Testifying expert for the Government. Ft. Bliss, Texas.

### Depositions

1) <u>De Groote v. University of Arizona</u> (2019). Intimate partner violence. Expert witness for the plaintiff victim.

2) <u>Moore v. Garland Crane</u> (2020). Sexual abuse of a child. Expert witness for the plaintiff parents of the child victim.

3) <u>Jane Doe v. Taos Municipal Schools et al.</u> (2022). Sexual assault on a public school campus. Expert witness for the plaintiff victim.

4) <u>Rebecca Baker v. Dr. Blayne McCaffrey and Norfolk Podiatry Center and Danelle Charf and Wanek Pharmacy</u> (2022). Mental health impact of an overdose prescription of Dilaudid that resulted in respiratory failure. Expert witness for the plaintiff.

5) <u>Robert Loera v. Kingsville Independent School District et al.</u> (2023). Sexual abuse of a child. Expert witness for the plaintiff victim.

6) <u>John Doe v. St. Johns Episcopal Church of Kissimmee, Inc.</u> (2023). Sexual abuse of a child. Expert witness for the plaintiff.

Appendix D

**Expert Testimony Schedule**

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-71

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

7) <u>Jane Doe v. Christopher Mauzy</u> (2023). Sexual assault. Expert witness for the plaintiff.

## Criminal Courts

1) <u>People of the State of Colorado v. Julian Santos-Campos</u>. Transfer waiver. Jefferson County District Court (2021). Expert witness for the defense in the area of the impact of domestic violence on child/adolescent development.

2) <u>People of the State of Colorado v. Connor Shaver</u>. Sexual assault. Boulder County Court (2021). Expert witness for the defense in the area of the impact of alcohol on memory and confabulation.

3) <u>People of the State of Colorado v. Jordon Miklos</u>. Sexual assault. El Paso County Court (2022). Expert witness for the prosecution in the area of the impact of alcohol on memory functioning and the neurobiological impact of trauma on memory.

4) <u>People of the State of Colorado v. Charles Higdon</u>. Sexual assault. Boulder County Court (2022). Expert witness for the defense in the area of the impact of alcohol-related blackouts on memory processes.

## Civil Courts

1) <u>Rebecca Baker v. Dr. Blayne H. McCaffrey et al</u>. District Court of Madison County, Nebraska (2023). Expert witness for the plaintiff in the area of the impact of overdose on psychological functioning.

2) <u>John Doe v. St. Johns Episcopal Church of Kissimmee, Inc.</u> (2024). Sexual abuse of a child. Expert witness for the plaintiff.

Appendix D

**Expert Testimony Schedule**

71

ATTORNEYS' EYES ONLY- HIGHLY CONFIDENTIAL

EXHIBIT 2-72

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

# Appendix E

## Curriculum Vitae

| | |
|---|---|
| **Name** | Donna L. Peters |
| **Address** | 1720 S. Bellaire St., Ste 907 |
| | Denver, CO 80222 |
| **Telephone** | 303-594-7604 |
| **Fax** | 720-529-1557 |
| **E-mail** | drdonnapeters@yahoo.com |

<u>**Education**</u>

2003–2006    Doctorate in Clinical Psychology, Psy.D., University of Denver, Graduate School of Professional Psychology, APA-accredited program.
Concentration: *Forensic Assessment/Behavioral Analysis*.
Doctoral Dissertation: *Sexual Victimization and Risk for Revictimization.*

2003–2005    M.A., University of Denver, Clinical Psychology.

1995–1998    M.Ed., University of Maryland, University College, Counseling and Personnel Services.
Thesis: *Factors Associated with Sexually Aggressive Attitudes and Behaviors*.

1990–1994    B.A., University of Maryland, University College, Asian Studies/Psychology.

**Professional Licenses/Certifications**

- Licensed Clinical Psychologist, CO-3153
- Certificate Program in Traumatic Stress Studies at the Trauma Center at Justice Resource Institute, Boston, MA
- Interjurisdictional Practice Certificate (IPC) and Temporary Authorization to Practice (TAP) from the PSYPACT Commission

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-73

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

**Professional Experience**

2006–Present    **Forensic Psychology Private Practice**

Conducting psychological and forensic assessments, including:

- Personality/cognitive functioning/traumatic brain injury (TBI)
- Trial competency
- Sentencing and mitigation
- Child abuse and neglect
- Domestic violence/intimate partner violence
- Malpractice
- Disability
- Re-sentencing
- Immigration relief
- Risk assessment/dangerousness
- Trauma assessments
- Personal injury and civil damages

Providing expert testimony and consultation services for both the prosecution/plaintiff and the defense/defendant in criminal, civil, military court martial, and federal immigration courts.

Expert content areas include:

- Psychological impact of sexual assault/abuse
- Intimate partner violence/domestic violence
- Post-assault victim response
- Neurobiological impact of trauma
- Posttraumatic Stress Disorder/symptoms
- Impact of alcohol on memory functioning/behavior
- Child pornography
- Impact of parental separation
- Human trafficking

Appendix E

**D. Peters CV**

73

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-74

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Torture/persecution

2005–Present **Forensic Psychological Evaluator:** Healthright International, Human Rights Clinic (formerly Doctors of the World)

- Conducting forensic evaluations with refugees from a variety of countries seeking asylum in the US.
- Determining the consistency of psychological sequelae with alleged experiences of persecution, torture, and sexual and other violence and reporting such findings in legal affidavits.
- Providing court testimony as an expert on the effects of trauma on psychological functioning.

2008–2016 **Forensic Examiner:** Denver Veteran's Administration Medical Center, Forensic Evaluator

- Conducted forensic assessments with returning combat veterans experiencing psychiatric injuries to determine the level of severity for service-connected disability
- Assessed conditions, including PTSD, mood disorders, substance use disorders, anxiety disorders, military sexual trauma, and TBI
- Developed legal affidavits that were used in the determination of government disability benefits
- Performed over 3,000 forensic evaluations/affidavits for the Veteran's Administration Review Board for legal case determination

2006–2009 **Director of Clinical Services:** Rape Assistance and Awareness Program (RAAP)

- Responsible for all aspects of the counseling department, including supervision of a large clinical staff, program development, community training, provision of expert testimony in sexual assault cases, and collection of statistics for grant funding purposes
- Provided direct clinical supervision for the trauma training program, which consisted of pre-doctoral and pre-master's students from a variety of mental health training programs

Appendix E

**D. Peters CV**

74

ATTORNEYS' EYES ONLY-HIGHLY CONFIDENTIAL

EXHIBIT 2-75

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Program Coordinator for the facility's APA-accredited predoctoral internship

2007–2008    **Psychological Evaluator:** Exempla West Pines Psychiatric Hospital

- Conducted psychological evaluations in emergency departments for the Exempla hospital network, including Saint Lutheran's Medical Center, Saint Joseph's Medical Center, and Good Samaritan Medical Center
- Evaluated psychiatric illness, suicidality, and chemical-dependency issues to determine the need for immediate patient hospitalization

2005–2006    **APA-Approved Doctoral Internship:** RAAP

- Conducted outpatient therapy on an 18-hours-per-week, clinically based rotation
- Conducted long- and short-term therapy, facilitated group therapy, conducted workshops and training in the area of sexual assault and trauma interventions, and supervised practicum students
- Provided in-house and community trainings on sexual assault issues
- Provided expert testimony in the areas of posttrauma victim response and trauma-related diagnoses

2004–2005    **Psychology Extern/Clinical Rotation:** Denver VA Medical Center, Substance Abuse Treatment Program

- Assessed substance-use issues for treatment and co-facilitated court-ordered groups for veterans charged with class-3–class-6 felonies, misdemeanors, or repeated alcohol/drug-related driving charges, as referred by the Veteran's Treatment Court

2003–2005    **Psychology Extern:** University of Denver, Professional Psychology Center

- Conducted forensic evaluations, including testamentary capacity, competency, and parental responsibility evaluations

Appendix E
**D. Peters CV**

75

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

**2003–2004**  **Psychology Extern/Clinical Rotation:** Kaiser Permanente, Behavioral Health Department

- Provided treatment services to children, adolescents, and adults with a wide range of presenting issues
- Conducted initial intake assessment, made a preliminary diagnosis, and provided the necessary ongoing short- or long-term therapy
- Participated in grand rounds with other Kaiser psychologists and psychiatrists

**2001–2002**  **Psychotherapist:** Memphis Sexual Assault Resource Center

- Provided treatment services for children, adolescents, adults, and affected family members with a recent or past history of sexual abuse or assault
- Served as the primary provider for children aged 5–12
- Conducted psychosocial evaluations and selected and implemented appropriate treatment interventions for an under-resourced population with a high degree of dual diagnosis
- Facilitated groups for adolescent survivors of sexual assault and adult survivors of childhood sexual abuse
- Trained sexual assault nurse examiner nursing students rotating through the agency as part of the University of Memphis nursing program

**1997–2001**  **Forensic Evaluator/Psychotherapist:** Army Behavioral Health, Torii Station, Okinawa, Japan

- Conducted forensic evaluations and risk assessments in both spousal- and child abuse allegations
- Facilitated groups for perpetrators of domestic violence, adult survivors of childhood sexual abuse, child witnesses of domestic violence, and children experiencing parental separation and divorce
- Provided after-hours crisis intervention for spousal- and child-abuse incidents, sexual assault, and combat-related trauma emergencies

Appendix E

**D. Peters CV**

76

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Worked closely with the Army Criminal Investigation Command in conducting forensic interviews with adults and children involved in violent incidents

**Teaching Experience**

Current          **Clinical Supervisor:** University of Denver, Graduate School of Professional Psychology, pre-doctoral students.  Provide consultation in forensic assessment and report writing to other psychologists.

2006–2017     **Clinical Supervisor:** Provided required supervision for state licensure for psychologists, advanced provider credentialing in EMDR therapy, and provider forensic evaluations addressing the influx of asylum seekers detained in Artesia, New Mexico, and Dilly, Texas

2006-2010     **Clinical Supervisor:** University of Denver, Graduate School of Professional Psychology, APA-approved internship for doctoral candidates

**Professional Organizations**

- Member: American Psychological Association
- Member: American Psychological Associate, Division of Trauma Psychology
- Member: American Psychology, Law Society
- Member: Healthright International, Human Rights Clinic, Volunteer Psychologist
- Rocky Mountain Immigrant Advocacy Network, Volunteer Psychologist in ICE detention cases

**Board Membership**

- Former Member of the Board of Directors, Rocky Mountain Immigrant Advocacy Network

**Editorial Activities**

- *Journal of Traumatic Stress*, ad-hoc reviewer

**Cross-Cultural Experiences**

Appendix E
**D. Peters CV**
77

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-78

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

1989–1991    Student visa, Japanese Language Institute: International Center of Language and Culture, Naha, Okinawa, Japan

2005–Present    Conducting forensic evaluations with individuals from over 40 countries

**Selected Trainings/Workshops**

- Conducting Forensic Evaluations Using Videoconferencing Technology, Randy Otto, Ph.D., ABPP & David Corey, Ph.D., ABPP.
- Forensic and Correctional Applications of the Personality Assessment Inventory, John Edens, Ph.D.
- Self-Regulation Deficits and Trauma in Psycholegal Settings, Jerrod Brown, Ph.D.
- MMPI-3 in Malingering Determinations, Martin Sellbom, Ph.D.
- Introduction to Using the MMPI-3 in Psychological Practice, Martin Sellbom, Ph.D.
- Psychological Evaluation of Causation and Damages in Personal Injury Cases, William Foote, Ph.D., ABPP.
- Adverse Childhood Experiences (ACEs) in the Criminal Justice System, Jerrod Brown, Ph.D.
- Advanced Training in Traumatic Brain Injury (TBI), Jerrod Brown, Ph.D.
- MMPI-3 for Forensic Psychologists, Yossef Ben-Porath, Ph.D., ABPP.
- Evaluation of Children in Personal Injury Cases, Jermour Maddux, Psy.D., ABPP.
- Evaluating Risk in Child Pornography Offenders, Kostas Katsavdakis, Ph.D., ABPP.
- Evaluations for High Stakes Sentencing: Capital and Juvenile Murder Cases, Mark Cunningham, Ph.D., ABPP.
- MMPI-3 in Personal Injury and Disability Evaluations, Martin Sellbom, Ph.D.
- Child Murder by Parents, Phillip Resnick, M.D.
- Evidence-Based Evaluations of Criminal Responsibility, Terry Kukor, Ph.D., ABPP.

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-79

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Evidence for Forensic Mental Health Professionals, David DeMatteo, J.D., Ph.D., ABPP.
- Trauma and Mental Disability Law, Michael Perlin, Esq. & Heather Cucolo, Esq.
- Assessing Allegations of Trauma in Forensic Contexts, Christina Pietz, Ph.D. ABPP.
- Psychological Evaluations in Personal Injury and Civil Rights Cases, William Foote, Ph.D., ABPP.
- The Role of Consultants and Expert Witnesses in Cases of Disputed Confessions, Brian Cutler, Ph.D. & Jeffrey Kaplan, M.Sc.
- Suggestibility in Children: Clinical and Forensic Considerations, Jerrod Brown, Ph.D.
- Allegations of Alienation or Child Sexual Abuse in Custody Evaluations, David Martindale, Ph.D., ABPP.
- Evaluation of Risk for Intimate Partner Violence Using the SARA V3, Stephen Hart, Ph.D.
- American Academy of Forensic Psychology, five-day conference.
- Ethics in Forensic Psychology Practice, Randy Otto, Ph.D., ABPP.
- Report Writing for Forensic Evaluation, Randy Otto, Ph.D., ABPP.
- Confabulation and Suggestibility in Clinical, Forensic, and Judicial Considerations, Jerrod Brown, Ph.D.
- Assessment of Malingering, Barry Rosenfeld, Ph.D., ABPP.
- Structured Interview of Reported Symptoms, second edition training, Richard Rogers, Ph.D., ABPP.
- Psychological Evaluations in Immigration Court, Virginia Barber-Rojas, Ph.D.
- Preparing for Board Certification in Forensic Psychology, Richard DeMier, Ph.D., ABPP.
- Advanced Certification in Trauma, Trauma Center at Justice Resource Institute, Boston, MA, Bessel Van der Kolk, MD, nine-month program.
- Fort Sam Houston Advanced Child Abuse/Domestic Violence Course.
- Fort Sam Houston Child Sexual Abuse Conference.

Appendix E
**D. Peters CV**
79

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Pacific Region Forensic Science Workshop, Child Abuse and Interviewing Techniques.
- Developmental Trauma, Bessel Van der Kolk, MD.
- Trauma and Impact on the Brain, Bessel Van der Kolk, MD.
- The Cutting Edge of Mind/Body Medicine.
- Adverse Childhood Experiences Study, Vincent Felitti, MD.
- Neurobiology of Trauma, Bessel Van der Kolk, MD.
- Doctors of the World Training, Conducting Forensic Evaluations in Asylum Cases.
- San Diego Conference on Responding to Child Maltreatment, John Briere, Ph.D. & David Finkelhor, Ph.D.

**Professional Presentations/Invited Guest Lecturer**

- Peters, D. *Self-Care and Ethics in the Immigration Law Practice,* American Immigration Lawyers Association Mid-Winter Conference, Curacao.
- Peters, D. *Working with Refugees and Torture Survivors.* University of Denver, Graduate School of Professional Psychology, International Disaster Program.
- Peters, D. *Assessing and Treating PTSD and Interpersonal Violence,* University of Denver, Graduate School of Professional Psychology, International Disaster Program.
- Peters, D. *Trauma Assessment and Working with Refugees,* University of Denver, Graduate School of Professional Psychology, International Disaster Program.
- Peters, D. *Eye Movement Desensitization and Reprocessing,* University of Denver, Graduate School of Professional Psychology, Doctoral Program in Clinical Psychology.
- Peters, D. *Common Victim Response Following Sexual Assault,* Rape Assistance and Awareness Program, Clinical Staff.
- Peters, D. *Understanding Self-Harm,* Rape Assistance and Awareness Program, Clinical Staff.
- Peters, D. *PTSD and Sexual Assault,* University of Denver, campus-wide Victim Advocate Program.

Appendix E

**D. Peters CV**

80

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-81

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

- Peters, D. *Working with Sexual Assault Victims and Victims of Interpersonal Violence,* Statewide Planned Parenthood Conference, Denver, CO.

- Peters, D. *Assessment and Interventions with Victims of Sexual/Domestic Violence,* medical interns, Swedish Medical Hospital, Denver, CO.

- Peters, D. *Assessment and Interventions with Sexual Assault Survivors and International Refugees,* University of Denver, Graduate School of Professional Psychology.

- Peters, D. *Understanding and Interventions with Prison Rape,* Department of Corrections, State of Colorado (all mental health staff).

- Peters, D. *Interventions in Trauma/PTSD,* University of Memphis.

- Peters, D. *Child Abuse Forensic Interviewing Techniques,* University of Maryland, College Park.

- Peters, D. *Responding to Domestic and Sexual Violence,* US Army Criminal Investigative Services/Military Police, numerous presentations.

- Peters, D. *Responding to Domestic and Sexual Violence Victims,* Air Force Office of Special Investigations, numerous presentations.

- Peters, D. *Victim Dynamics of Sexual Assault and Interpersonal Violence,* Naval Criminal Investigative Services, numerous presentations.

- Peters, D. *Understanding and Preventing Sexual Assault,* US Naval Hospital, Okinawa, Japan, Women's Health Care Symposium.

- Peters, D. *Victimology and Intervention in Sexual Trauma/PTSD,* US Marine Corps/Navy Chaplains Unit, Okinawa, Japan.

- Peters, D. *Understanding and Intervening in Child Abuse,* Department of Defense Schools (DoDS), Okinawa, Japan, multiple presentations.

- Peters, D. *Understanding Child Sexual Abuse/Adult Assault,* Naval Criminal Investigative Service, Okinawa, Japan, multiple presentations.

- Peters, D. *Sexual Assault Prevention,* US Marine Corp-wide stand down, Okinawa, Japan, multiple presentations.

- Peters, D. *Responding to Sexual Assault Survivors/PTSD,* US Naval Hospital, emergency room personnel, Okinawa, Japan, multiple presentations.

Appendix E

**D. Peters CV**

81

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-82

DocuSign Envelope ID: 79613F6B-CA36-4AEF-94FE-A715FCFBF805

Confidential Report

Holly Shuster

**Published/Broadcast Interviews**

- Peters, D. (2018). Interviewed by Nicole Einbinder. *How Trump's Family Separation Policy Has Affected Parents*. PBS FRONTLINE.

*Updated January 2024*

Appendix E

**D. Peters CV**

ATTORNEYS' EYES ONLY-
HIGHLY CONFIDENTIAL

EXHIBIT 2-83